UNITED STATES of America,
Plaintiff,

and

Lynda Lee Osborne, Plaintiff–
Intervenor,

v.

HABERSHAM PROPERTIES, INC.,
Habersham Properties d/b/a Crescent
Court Apartments, Peachtree Battle
Investors, LLC, and Suzanne Monner,
Defendants.

No. CIV.A. 1:02–CV–1531–.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 6, 2003.

William S. Duffey, Jr., Amy L. Berne, Laura S. Kennedy, Office of United States Attorney, Atlanta, GA, Joan A. Magagna, phv-DOJ, Isabelle M. Thabault, phv-DOJ, Charla D. Jackson, phv-DOJ, U.S. Department of Justice, Civil Rights Division, Washington, DC, for USA, plaintiff.

Kevin Quirk, Quirk & Quirk, Leticia D. Alfonso, Jason Charles Grech, Cushing, GA, Morris Armbruster & Jones, James Matthew Anthony, Office of J. Matthew Anthony, Atlanta, GA, for Habersham Properties, Inc., Habersham Properties dba Crescent Court Apartments, Peachtree Battle Investors, L.L.C., Suzanne Monner, defendants.

**1.** Section 3614(e) of the FHA provides that "any person may intervene in a civil action commenced by the Attorney General ... which involves an alleged discriminatory housing practice with respect to which such person is an aggrieved person or a conciliation agreement to which such person is a party." 42 U.S.C. 3614(e).

## ORDER

MARTIN, District Judge.

This action is before the court on the defendants' Motions for Summary Judgment [Doc. Nos. 50–1, 53–1 and 57–1] and defendants' Motions for Oral Argument [Doc. Nos. 51–1 and 54–1].

### I. *Procedural Background*

On June 13, 2002, the United States (hereinafter "the U.S." or "the government") initiated this action against Habersham Properties, Inc. ("Habersham"), Peachtree Battle Investors, LLC ("PB Investors"), and Suzanne Monner ("Monner") for violation of the Fair Housing Act (hereinafter "the FHA" or "the Act"). 42 U.S.C. § 3601, *et seq.* On August 9, 2002, Lynda Lee Osborne ("Osborne") intervened in this action pursuant to section 3614(e) of the Act [1] and Fed.R.Civ.P. 24.[2] On March 20, 2003, defendant Habersham and defendant PB Investors filed motions for summary judgment with this court. Defendant Monner filed a motion in support of Habersham's motion for summary judgment on April 11, 2003.

### II. *Factual Background*

The facts set forth here give all deference to the plaintiffs' version of the facts, as is required in a summary judgment setting. Accordingly, the court does not consider this account of the facts to be "factual findings" by the court and the court will not be bound by this account in future proceedings in this or any other action.

**2.** Osborne has filed jointly with the government on the motions relevant to this order. For the sake of brevity, the court will discuss arguments as being asserted by the government. The court recognizes, however, that Osborne has joined in these motions.

PB Investors is the corporate owner of the Crescent Court Apartments ("Crescent Court"). PB Investors is headquartered in DeKalb County and it has owned Crescent Court since 1994. Crescent Court is the only asset of PB Investors. Habersham is a property management company that was hired by PB Investors to manage Crescent Court. Habersham manages approximately 26 other residential complexes in the Northern District of Georgia. Monner is the on-site community manager at Crescent Court and has been since 1992, before PB Investors bought the complex. She is an employee of Habersham. When Habersham took over management of the complex, it was decided that Monner would be maintained in her position.

The U.S. alleges that the defendants have violated the FHA by having a "pattern or practice of discrimination" in their leasing practices. The "pattern or practice of discrimination" allegation that the government asserts against the defendants is founded on three separate factual bases. All three of the bases involve the behavior of Monner when conducting the leasing matters of Crescent Court.

### A. *Lynda Osborne*

The first assertion relates to the interaction plaintiff-intervenor Osborne had with Monner when attempting to lease an apartment at Crescent Court. On January 25, 2001, Osborne, who is African–American, went to Crescent Court to inquire about the availability of an apartment. Monner told her there were no apartments currently available. During her visit, Osborne received information regarding the apartments, such as the floor plans, the rent range and a blank application. Before Osborne left, she filled out a guest card and Monner told her to check back after February 1, noting that tenants usually gave notice of their intention to vacate on the first of the month.

On Monday, January 29, 2001, Osborne called Crescent Court using a British accent and inquired about apartment availability. Monner told her there was an apartment available. The following morning, Osborne went to Crescent Court in person to inquire about availability. Monner again told her there was nothing available and suggested she come back on February 1. Later that afternoon, Osborne called Crescent Court again using a British accent and an alias of "Katherine Windsor." During this phone call, she confirmed that an apartment was available. Osborne also had a Caucasian acquaintance, Kevin Shepard, visit Crescent Court and inquire about apartment availability. Monner told Mr. Shepard that there were no available apartments. Monner also told Mr. Shepard she would help him any way she could. Shortly after this event, Osborne filed a complaint with the Department of Justice.

### B. *Fair Housing Tests*

The second factual allegation arises from a series of government tests run for the purpose of determining whether Crescent Court was violating the FHA in its leasing practices. These tests are run by sending similarly situated "testers" into the subject establishment to monitor the results. The "testers" represent themselves to be as similar to one another as possible, except as to race, or whatever other characteristic is suspected to be the discriminatory trigger. These tests were begun in response to Osborne's complaint.

#### 1. *The May Test Group*

For a little over a week, between May 18 and May 24, 2002, the first government test was conducted at Crescent Court. During the course of this week, the government sent five "testers" to Crescent Court. A Caucasian female tester tele-

phoned Crescent Court on May 18 and was told by Monner that there was an apartment available. Monner said it would be available for viewing on Monday, the 21st. On May 21, an African–American male tester was told that there were no apartments available at Crescent Court and was referred to the Westchester Apartments ("the Westchester").[3] The following day, a Caucasian male tester visited Crescent Court and was allowed to see a vacant apartment. On Thursday, May 24, a Caucasian female tester and an African–American female tester were both told that there were no available apartments. They were both referred to the Westchester. During this time period, there was an apartment available. Apartment # 1021–B had been vacant since April 30, 2001 and was leased out again on May 31, 2001.

### 2. The June Test Group

During the week of June 18, the second group of government testers began inquiring at Crescent Court. This group consisted of three testers: a Caucasian female, a Caucasian male, and an African–American male. The inquiries were all made at different times of the day. The Caucasian female called Crescent Court at 3:15 p.m. on June 18. Two days later, the African–American male tester visited Crescent Court at 9:30 a.m. Later that same day, shortly after 11:00 a.m., the Caucasian male tester visited Crescent Court. All three testers were initially told that there would be no apartments available until August 15. However, throughout the conversations with the male and female Caucasian testers, Monner eventually changed her statement and said an apartment would be available on August 1.

### 3. The August Test Group

The third test group approached Crescent Court on the 20th and 21st of August, 2001. This test involved a phone call from a Caucasian male on August 20, during which he was told there was an available apartment. The following day, an African–American male tester visited Crescent Court and was told nothing would be available until September 15. A Caucasian male visited later the same day and was allowed to see a vacant apartment.[4]

### C. The Aggrieved Parties

The third and final factual basis for the government's claim against the defendants involves encounters of various "aggrieved parties," as defined by 42 U.S. § 3602(I).[5] The government names several African–American persons it claims have suffered racial discrimination at Crescent Court.

---

**3.** The Westchester is also managed by Habersham and personally attended to by Monner. The government alleges, among other things, that Monner steered African–Americans towards renting at the Westchester, rather than Crescent Court.

**4.** A fourth test group was sent to Crescent Court on October 24, 2001. This group was made up of two Caucasian female testers. Only one of the testers actually interacted with Monner. The tester was told there were no vacancies and was referred to the Westchester. The government contends that this group was testing for familial status discrimination, rather than race, as indicated by the fact that the test group contained two Caucasian females. The defendants assert that this

group demonstrates they do not only refer African–Americans to the Westchester, as alleged by the government. The court will consider these facts in the light most favorable to the non-moving party, the government, as is required during the summary judgment stage. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**5.** Section 3602(I) of the FHA defines an "aggrieved person" to include "any person who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S. § 3602(I).

The alleged aggrieved parties are Sybrina Atwaters, Rabiah Parker, Lakeisha Williams, Hermeyone Hunter, Joyce Smith, and Sharon and Colin Blackman. Monner put the letters "B" or "A" on the guest cards of Ms. Atwaters, Ms. Parker and the Blackmans. From Monner's deposition, it was learned that she intended these letters to indicate the race of the applicants. Monner told all of the aggrieved parties that there were no apartments available when they visited Crescent Court. In the case of Ms. Parker and Ms. Atwaters, Monner leased apartments on the days of their visits or shortly thereafter to Caucasian females. Ms. Williams visited Crescent Court on September 18, 2000 and was told there were no apartments available. Monner spoke to vendors about having the floors of a vacant apartment refinished on September 26, 2000. This particular vacant apartment was leased out again on October 20, 2000 to a Caucasian female. Ms. Hunter visited Crescent Court on behalf of her mother, Joyce Smith, in March of 1997. She was told that there were no available apartments at Crescent Court. Monner then showed Ms. Hunter apartments at the Westchester, which is where Ms. Hunter's mother eventually leased an apartment. The Blackmans visited Crescent Court on July 26, 2000 and were told that no apartments were available. There is no dispute that there were no apartments available at the time of the Blackmans' visit.[6]

### D. *The Charges*

Based on its fair housing testing, Osborne's claims, and the facts surrounding the other aggrieved parties' encounters with Monner, the government initiated this case against the defendants. The government contends that these actions constitute violations of the FHA. In particular, the government alleges that the defendants have engaged in a pattern or practice of discrimination against persons based on their race. The government seeks both legal and equitable relief.

Habersham and PB Investors have filed separate motions for summary judgment arguing on different issues and incorporating the arguments of the other. Habersham's motion focuses on the issue of liability for a pattern or practice of discrimination. Habersham claims that the record contains insufficient evidence to demonstrate that there was a pattern or practice of discrimination at Crescent Court. They argue that since establishment of a pattern or practice of discrimination is a predicate for a violation of the FHA, the government's allegations must fail as a matter of law.

Alternatively, if Habersham's motion is unsuccessful, PB Investors' motion contends, among other things, that Habersham and itself (collectively "the corporate defendants") should not be held vicariously liable for the actions of Monner.

### III. *Summary Judgment Standard*

Summary judgment is proper only "if ... there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be

---

**6.** Nikita Jordan is another party discussed by the government. She is not listed as an aggrieved party, but rather as a potential witness. She apparently visited Crescent Court on June 22, 2000. Ms. Jordan did fill out a guest card, and Monner put a "B" on the guest card. The evidence shows that she was never a resident of Crescent Court. She has not given any testimony by deposition or affidavit in this case. Additionally, the defendants' demonstration that Unit 117C, the unit the government claims was available, was not available at the time of her visit, has been unrebutted by the plaintiffs.

drawn in his [or her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court is mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255, 106 S.Ct. 2505. The plaintiff must do more, though, than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The non-movant may not avoid summary judgment with evidence that is "merely colorable or is not significantly probative." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir.1997). This determination of whether there is a question of fact for the jury must be guided by the substantive evidentiary standard that applies to the case at hand. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## IV. *Pattern or Practice of Discrimination Under the Fair Housing Act*

■ Discrimination in the rental housing market has been prohibited under the Fair Housing Act. Section 3604(a) makes it unlawful "to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The FHA confers on the government the power to bring a civil action against "any person or group of persons ... engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this [Act] ..." 42 U.S.C. § 3614(a).[7]

■■ The government has the burden of proof on whether the defendant has participated in a "pattern or practice of discrimination." To establish a "pattern or practice of discrimination, 'the government must demonstrate' by a preponderance of the evidence that ... discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).[8] Isolated, accidental, or sporadic instances of discrimination are insufficient to establish a "pattern or practice of discrimination." *Id.*

■ Although isolated, accidental or sporadic misconduct do not rise to the level of pattern or practice, there is no

7. The government may also bring a suit if a violation "raises an issue of general public importance," under Section 3614(a) of the Act. This allows the government to pursue a case, even if it does not rise to the level of pattern or practice, so long as the conduct jeopardizes important public interests. The government does include this claim in its complaint, but the parties' motions focused almost exclusively on the pattern or practice claim. Because the court finds that there are material issues of fact which require denial of the summary judgment motion on the pattern or practice claim, the court finds it unnecessary (as apparently did the parties) to discuss what amounts to the lesser standard of "general public importance." Accordingly, the court's analysis will focus on the pattern or practice claim.

8. Although *Teamsters* is a Title VII case, constructions of terms are often interchanged in civil rights contexts. *See, e.g., United States v. Lansdowne Swim Club*, 894 F.2d 83, 88 (3d Cir.1990) (using the construction of "pattern or practice" from *Teamsters* in a Title II case); *United States v. Di Mucci,* 879 F.2d 1488, 1497 n. 11 (7th Cir.1989) (using the construction of "pattern or practice" from *Teamsters* in a Fair Housing Act).

threshold number of incidents that must occur before the government can bring suit against a party. *U.S. v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 123–24 (5th Cir.1973). Each case must be evaluated on an individual basis and "turn on its own facts." *Id.* at 124 (quoting *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir.1971)). The determination of whether evidence indicates a pattern or practice of discrimination is ordinarily a question of fact for the jury. *See United States v. Balistrieri*, 981 F.2d 916, 930 (7th Cir.1992).

### V. *Discrimination at Crescent Court?*

In the instant case, the determination of whether the conduct of the defendants constitutes a pattern or practice of discrimination must necessarily be left to the jury. The parties dispute the legal significance and inferences that should be drawn from the fair housing testing and Osborne's experience. There are also factual disputes regarding the circumstances of the encounters between Monner and the aggrieved parties. Therefore, the court is precluded from granting summary judgment on the issue of whether the defendants engaged in a pattern or practice of discrimination.

First, the fair housing testing, while not conclusive, is open to the interpretation that discrimination was occurring at Crescent Court. The defendants ask the court to infer that what was seemingly discriminatory conduct on the part of Monner was motivated by other factors. During the May test, the defendants claim Monner's refusal to allow an African–American male tester to see an apartment, even though (1) one was available, and (2) the day before she had told a Caucasian female that one was available, was poor salesmanship and nothing more. The defendants assert that this conclusion is warranted, because later in the week, Monner referred an African–American female and a

Caucasian female to the Westchester, despite the available apartment. This could be an example of simply poor salesmanship; however, taken with the other evidence and interpreted in the light most favorable to the government, it could also be interpreted as discriminatory conduct. The defendants urge upon this court that the June test can be explained as well. The Caucasian testers came at later points in the day and were able to have full conversations with Monner. During these conversations, her memory was jogged and she remembered that an apartment would be available at an earlier time. It is undisputed that Monner had a shorter conversation with the African–American tester. What is disputed, however, is whether the shorter conversation with the African–American, which did not include the realization she had during her conversation with the Caucasian testers, was attributable to Monner not being ready for a visitor at the early hour of the visit or because of racial animus. Either inference is plausible and it is the place of the jury to make this determination. Lastly, the August test also presents an opportunity for alternative rationales for Monner's behavior. The defendants contend that Monner was confused about the status of the apartment. While this is a possible inference because of some unrelated questions surrounding the leasing of this apartment, it is a determination a jury needs to make. Again, while these tests were not conclusive, they could support a jury finding that the defendants engaged in a pattern or practice of discrimination.

The second basis for the allegation, the experience of Osborne, viewed in the light most favorable to the government, buttresses the inferences drawn from the results of the fair housing testing. Although, as the defendants point out, Osborne never identified her race when using the British accent over the phone as

Katherine Windsor, inferences can be drawn from Monner's statements that indicate she believed she was speaking to a Caucasian woman. The facts and inferences involving this situation would allow a jury to conclude that Monner preferred Windsor over Osborne, because of her race.

Lastly, as to the allegations of discriminatory conduct towards the aggrieved parties, there are genuine issues of material fact that make summary judgment inappropriate. The findings of fact surrounding the allegations of discriminatory conduct will determine whether these incidents, alone or in combination with the other evidence, establish a pattern or practice of discrimination. The incidents involving Ms. Parker and Ms. Atwaters in which Monner leased to Caucasian females shortly after their visits contain disputed facts as to when the Caucasian females came to Crescent Court in relation to when the apartments became available. Similarly, in the incident involving Ms. Williams, the parties do not agree as to the date when the former tenant actually vacated the apartment. The parties agree that a lease for the apartment ended in August and that Monner called the vendors to refinish the floors on September 26. They also agree that Ms. Williams visited Crescent Court on September 18. However, a dispute ultimately exists as to when the apartment became available for rent.

With regard to the incident involving Ms. Hunter and her mother, there is also a dispute as to whether there were any apartments available at the time of Ms. Hunter's visit. The parties have presented contradictory evidence and at trial the government will have the burden of proving there was an apartment available at the time. Lastly, while it is not disputed that there were no apartments available at the time the Blackmans visited, there is a

question regarding whether Monner knew of upcoming vacancies and whether she truly followed a policy of not considering apartments available until they were actually vacant.

The court notes that the United States and the defendants are proffering evidence that is conflicting regarding the details of these transactions. Reconciling these conflicting sets of evidence to determine whether Monner was engaging in discriminatory conduct would require the court to weigh evidence in a manner that is inappropriate in the current posture of summary judgment. Such considerations are exclusively the domain of factfinders, and beyond the scope of the determinations the court is permitted to make as a matter of law. Furthermore, Monner's racial coding makes the inference of a pattern or practice of discrimination all the more likely. Accordingly, the court concludes that it cannot determine, as a matter of law, whether Monner's conduct during these encounters was discriminatory and, thus, tending to create a pattern or practice of discrimination.

Based on the above stated reasons, summary judgment as to whether the defendants have a "standard operating procedure" of discrimination, thereby qualifying as a "pattern or practice of discrimination," is inappropriate in this case. There are disputes as to genuine issues of material facts. Additionally, there are inferences that can be drawn from other evidence that would allow a jury to find in favor of the plaintiffs. Therefore, the court denies summary judgment on the issue of whether the defendants engaged in a pattern or practice of discrimination.

## VI. *Damages*

### A. *Separation of the Corporate Defendants*

In the last argument of its motion for summary judgment, PB Investors also

asks this court to separate and distinguish any liability it may have from any liability which may be attributable to Habersham. Since the decision on this point could affect the rest of the discussion of vicarious liability, the court will address this issue first.

■ PB Investors claims that it should not be liable for the actions of Monner because no employer/employee relationship existed between them. PB Investors relies on the Supreme Court's decision in *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) to support its claim. In *General Bldg. Contractors*, the Court held that a contractor and a trade association could not be held liable for the discriminatory conduct of a union. The Court observed that holding the contractor and trade union liable because they had the power to oppose the union's discriminatory practices, would "convert every contractual relationship into an agency relationship, a result clearly unsupported by the common-law doctrines." *Id.* at 394, 102 S.Ct. 3141.

■ In the instant case, PB Investors may be liable for the conduct of Habersham and Monner, because their relationship is an agency relationship, not a contractual relationship. An agency relationship is established by "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958). Habersham, as the management company of Crescent Court, is clearly the agent of PB Investors. Habersham manages the complex on behalf of PB Investors and submits to the control of PB Investors, even if PB Investors did not often exercise this control. Habersham, as a corporation, can only act through individuals, its employees.

Therefore, PB Investors can be held liable for the conduct of Monner.

## B. *Vicarious Liability*

■ It is has long been established that the FHA provides for vicarious liability. *Meyer v. Holley*, 537 U.S. 280, 123 S.Ct. 824, 828, 154 L.Ed.2d 753 (2003). This vicarious liability is based on traditional theories of agency law. *See id.* at 830–31 (rejecting the Ninth Circuit's contention that the FHA called for "more extensive vicarious liability—that the Act went well beyond traditional principles."). "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for the acts of their agents or employees in the scope of their authority or employment." *Id.* at 829 (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 756, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("An employer may be liable for the negligent and intentional torts committed by an employee within the scope of his or her employment"); *New Orleans, M. & C.R. Co. v. Hanning*, 82 U.S. 649, 15 Wall. 649, 657, 21 L.Ed. 220 (1872) ("The principal is liable for the acts and negligence of the agent in the course of his employment, although he did not know of the acts complained of"); *see Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 967 (7th Cir.1986) (" 'respondeat superior' . . . is a doctrine about employers . . . and other principals")). *See also United States v. Northside Realty Associates, Inc.*, 474 F.2d 1164, 1168 (5th Cir. 1973) (holding that imputing liability to a corporation when an executive "acted within the scope of his duties" and "with the intention of benefiting the corporation" was appropriate under the FHA).

■ Habersham and PB Investors assert that they should not be liable, because they did not "[know] about, authorize or

ratify any of the alleged discriminatory conduct." (Def. PB Investors' Mot. Summ. J. at 9). Furthermore, the corporate defendants assert that their good-faith efforts to prevent discrimination should preclude vicarious liability in this case. The standard the corporate defendants seek to have applied to this case is not the appropriate standard. In *Meyer*, the Supreme Court concluded "that the Act imposes liability without fault upon the employer in accordance with traditional agency principles, i.e., it normally imposes vicarious liability upon the corporation but not upon its officers or owners." 123 S.Ct. at 827. Here, the government only seeks to establish the vicarious liability against the corporate entities. Therefore, the corporate defendants' liability will be determined by traditional rules of vicarious liability.

In the instant case, all of Monner's actions were in the scope of her employment and for the benefit of Crescent Court. It was in the scope of her employment that she was interacting with applicants and making judgments regarding applicants. Therefore, it will be appropriate to hold both Habersham and PB Investors vicariously liable for Monner's actions.

### C. *Punitive Damages*

 In addition to their argument for summary judgment as to vicarious liability, the corporate defendants have also moved for summary judgment as to their vicarious liability for punitive damages. It is well established that agency principles limit vicarious liability for punitive awards. *Kolstad v. American Dental Association*, 527 U.S. 526, 541, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).[9] In *Kolstad*, the Supreme Court held that the limitation on vicarious liability for punitive damages should be based on the actions of the employer. Accordingly, the Court held that "giving punitive damages protection to employers who make good-faith efforts to prevent discrimination in the workplace accomplishes ... [the] objectives of motivating employers to detect and deter" violations. *Id.* at 546, 119 S.Ct. 2118 (citing the dissenting opinion from the en banc hearing in the Court of Appeals for the District of Columbia, *Kolstad v. American Dental Association*, 139 F.3d 958, 974 (1998) (Tatel, J., dissenting)).

In the instant case, there are genuine issues of fact as to the sufficiency of Habersham's efforts to prevent Monner from discriminating. The defendants have offered evidence that they made good-faith attempts to ensure compliance with the FHA. They have provided evidence of the annual seminars Monner attended at their expense. They also require their other employees to attend this training. One of Habersham's quality assurance techniques was having the leasing offices of its complexes "shopped." A "shop" is conducted by having an unidentified person inquire about an apartment at a complex and report back on various customer service issues. During one of Monner's "shops," it was noted that her response to a question indicated a failure to comply with the FHA. Mark Chandler, Habersham's president, did speak to her about the "shop" and there were two follow-up "shops."

However, as the U.S. points out, while Chandler often inspected Monner's files, he never noticed or questioned Monner's racial coding system on the cards. With respect to the shops, there is no indication that these gave special attention to FHA concerns. In fact, there is evidence that

---

**9.** The *Kolstad* case addressed punitive damages in a Title VII case. Under the same rationale that applied in *Teamsters*, the constructions of terms are often interchanged in civil rights contexts, the Title VII analysis for limitation on punitive damages should be used for the FHA.

suggests that Habersham's switch to a new company for purposes of conducting these shops resulted in shops that focused less on FHA compliance.

Again, as with the liability determination, the parties are asking this court to weigh evidence and serve as a factfinder. This is not an appropriate determination for the court to make during the summary judgment stage. Therefore, the court concludes that it cannot determine, as a matter of law, whether Habersham's and PB Investor's efforts were sufficient to be considered "good-faith efforts to prevent discrimination" conduct by their employees. Therefore, the court cannot grant summary judgment as to punitive damages in this case.

## VII. *Summary*

Based on the foregoing reasons, the defendants' Motions for Summary Judgment are each DENIED [Doc. Nos. 50–1, 53–1 and 57–1]. Defendants' Motions for Oral Argument [Doc. Nos. 51–1 and 54–1] are also each DENIED as MOOT.

The parties are hereby DIRECTED to file a consolidated pretrial order within twenty (20) days of the docketing of this Order.