UNITED STATES of America,
Plaintiff,

v.

Bobby VEAL and Jewel
Veal, Defendants.

No. 02–0720–CV–W–DW.

United States District Court,
W.D. Missouri,
Western Division.

Aug. 24, 2004.

Charles M. Thomas, Office of the United States Attorney, Kansas City, MO, Erin

Meehan Richmond, Trial Attorney, Rebecca B. Bond, Timothy J. Moran, U.S. Department of Justice, Washington, DC, for Plaintiff.

Geary Jaco, Kansas City, MO, for Defendants.

### ORDER

WHIPPLE, District Judge.

Before the Court are Defendants' motion for new trial, or in the alternative, motion for relief from judgment, or in the alternative, motion for remittitur or reduction in judgment. (Doc. No. 81.) For the following reasons, the motions are denied.

### I.

On June 12, 2003, the Court entered a default judgment against Defendants Bobby and Jewel Veal after they refused to participate in discovery and failed to comply with the Court's Order of April 15, 2003. With the entry of default, the Court found that the Veals had violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, by engaging in a pattern or practice of housing discrimination on the basis of sex. (Doc. No. 29.)

From May 10–13, the case went to trial on the issue of damages. At trial, the Government identified eleven women ("aggrieved women") who it alleged were victims of the defendants' discriminatory housing practices, and sought compensatory and punitive damages for each. Through the testimony of the aggrieved women, among others, the Government sought to demonstrate that Bobby Veal made unwanted physical and verbal sexual advances towards the women, and that Jewel Veal knew of her husband's harassment but did nothing to stop it. The jury returned a verdict in favor of the Government, finding that the eleven aggrieved women were harmed by the Veals' practice of discrimination based on sex. A total of $47,804.00 in compensatory damages and $1,055,000.00 in punitive damages was awarded against them.[1]

In the pending motions, the Veals seek various forms of relief from the judgment against them. Numerous arguments are raised in support of the motions. Each will be addressed in turn.

### II.

#### A. *Alleged Attorney Misconduct and Entry of Default Judgment*

In an Order dated April 15, 2003, the Court wrote the following:

> [T]here is adequate information in the record showing that Defendants' failure to respond to discovery thus far is deliberate, intentional and designed to thwart the United States' effort to pursue this case. Therefore, the Court will require the Defendants to immediately serve complete responses to the United States pending discovery requests or the Court will impose sanctions including dismissal of Defendants' pleadings and entry of judgment on liability in favor of the United States.

(Doc. No. 17 at p. 4.) In addition to the above warning, the Court ordered the Veals to pay $2,000.00 to the plaintiff as a discovery sanction. *Id.*

On June 12, 2003, after the Veals failed to make the $2,000.00 payment and repeatedly refused to engage in discovery, the Court struck the defendants' pleadings and entered judgment in favor of the plaintiff. (Doc. No. 29.) In so doing, the Court held that the Veals had violated the Fair Housing Act by engaging in a pattern or

---

1. The above provides only a brief factual sketch of the case. As other facts become relevant, they are discussed.

practice of housing discrimination on the basis of sex. *Id.*

The Veals now contend that the Court erred by striking their pleadings and entering the judgment of default. Though the Veals concede that they failed to comply with discovery, they claim that their former attorney, Geary Jaco, not the parties themselves, is to blame. For example, they state that Mr. Jaco did not timely supply them with the plaintiff's discovery requests and concealed from them the court imposed $2,000.00 sanction. Because Mr. Jaco's misconduct led to the entry of the default judgment, the Veals urge the Court to set aside the default judgment and grant them a new trial.

 Parties choose counsel at their peril. *Inman v. Am. Home Furniture Placement, Inc.,* 120 F.3d 117, 118 (8th Cir.1997). It is "well-established that a party is responsible for the actions and conduct of his or her counsel and that, under appropriate circumstances, dismissal or default may be entered against a party as a result of counsel's actions." *Everyday Learning Corp. v. Larson,* 242 F.3d 815, 817 (8th Cir.2001). Default judgement, as a discovery sanction for counsel's misconduct, may be appropriate even without a finding of bad faith or willful misconduct on the part of the party. *Id.*

 Applying the law to the facts at hand, and taking the Veals at their word— not an easy thing to do[2]—the Court concludes that it did not error in entering the judgment of default. Assuming that Mr. Jaco was, in fact, solely responsible for the Veals' failure to comply with discovery, it

is not improper for this Court to hold the defendants accountable for their lawyer's misconduct. *Everyday Learning,* 242 F.3d at 817–18. "While it may seem harsh to make defendants answer for their attorney's behavior, any other result would punish [the plaintiff] for the inaction of [its] opponents' lawyer. Defendants are better suited to bear the risk." *Inman,* 120 F.3d at 118–19. Further, "[i]f they were truly diligent litigants who were misled and victimized by their attorney, they have recourse in a malpractice action." *Id.See also Glick v. Henderson,* 855 F.2d 536, 541 (8th Cir.1988) ("[The] remedy for any ineffective assistance of counsel is a suit against his attorney for malpractice, not a new trial.")

In addition, the Court notes that the entry of default was not the first sanction imposed. Admittedly, "[t]he entry of default judgment should be a 'rare judicial act.'" *Comiskey v. JFTJ Corp.,* 989 F.2d 1007, 1009 (8th Cir.1993). However, as set forth above, the entry of default was not the Court's first choice; rather, an attempt was made to curb the defendants' discovery violations through a monetary sanction. This fact, among others, distinguishes the present situation from *Baker v. Gen. Motors Corp.,* 86 F.3d 811 (8th Cir.1996), a case cited by the Veals.

Lastly, the Court questions whether the Veals suffered any real prejudice because of the entry of default. The default judgment established that Defendants had engaged in a pattern or practice of housing discrimination based on sex. Thus, the judgment established their general liabili-

---

**2.** Throughout the litigation of this case, Bobby Veal has proven himself to be a shade less than credible. By way of example, in an affidavit submitted to this Court, Mr. Veal swears under oath that he was not aware that a default judgment had been entered against him until *after* the trial on damages when told by his present counsel. Def. Mot. at Ex. 19.

This is simply not true. During trial, the undersigned informed Mr. Veal that a default judgment had been entered and patiently explained to him the effect of the judgment. Transcript at p. 23–24. This is but one example demonstrating Mr. Veal's aversion to the truth.

ty. The Government was still required to prove at trial that the eleven women it identified were victims of the Veals' discriminatory practice. The Government succeeded in doing so.

### B. Statute of Limitations

■ The Veals argue that certain claims brought by the Government are barred by Missouri's statute of limitations. As an affirmative defense, the defendants bear the burden of proving that the claims asserted against them are time-barred. *Motley v. United States*, 295 F.3d 820, 822 (8th Cir.2002). Unfortunately for the Veals, any statute of limitations defense they might have asserted was waived when their pleadings were struck and a default judgment was entered. *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d 493, 495 n. 2 (9th Cir. 1992).

### C. Punitive Damages

■ Next, the Veals argue that the punitive damages award of $1,055,000.00 is unconstitutionally excessive under *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) and *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In *Gore*, and later in *State Farm*, the Supreme Court outlined three guideposts that courts should consider in determining whether a punitive damages award is unconstitutionally excessive: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 575, 116 S.Ct. 1589; *State Farm*, 538 U.S. at 418, 123 S.Ct. 1513.

■ With regard to the first of the guideposts, the Supreme Court has stated that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513 (citing *Gore, supra*, at 575, 116 S.Ct. 1589). To determine the defendant's reprehensibility, a court should consider whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had a financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.*

Applying these factors to the facts in this case, the Court finds that the Veals' conduct is of the most reprehensible sort. Each of the victims was financially vulnerable—all of the women were receiving Section 8 public housing assistance at the time of the harassment, and several had been homeless prior to renting from the Veals. Though most of the women experienced economic injuries, by and large the harm done was physical. For example, Mr. Veal raped LaTonya Winters on two separate occasions and fondled most of the women numerous times. Further, the Veals' conduct was intentional and evinced a reckless disregard for the health and safety of the women. Mr. Veal secretly entered the homes of the women without notice, which had the effect of destroying any sense of security that the women had in their homes. For her part, Mrs. Veal did nothing to stop her husband's conduct or ensure the safety of the women. Instead, Mrs. Veal took the position that complaining victims were merely "bitches trying to get free rent and trying to get somewhere,

get out of paying rent." Transcript at p. 141.

The Court also notes that the Veals' conduct was not isolated but was of a recidivistic nature. *See Gore,* 517 U.S. at 577, 116 S.Ct. 1589 ("[A] recidivist may be punished more severely than a first offender [because] repeated misconduct is more reprehensible than an individual instance of malfeasance.") The specific harassing conduct experienced by each victim was part and parcel of the overall harassment suffered by all of the victims. Though different in terms of degree, each woman experienced the same humiliation and degradation. Further, the Veals' method of harassment was similar as to each woman. The progression of sexual harassment began with lewd comments and stares and then led to unauthorized visits and unwanted touching (and, for one woman, rape)—all under the watchful but blind eye of Mrs. Veal.

For these reasons, and in light of the other evidence in the record, the Court finds that the Veals acted reprehensibly. This factor therefore weighs heavily in favor of the punitive damages award.

■ Turning to the second guidepost, the Court must consider the disparity between the actual or potential harm to the women and the punitive damages award. This requires an examination of not only the harm actually suffered by the victims but also "the magnitude of the potential harm that the defendant's conduct would have caused to his intended victim if the wrongful plan had succeeded, [including] the possible harm to other victims that might have resulted if similar future behavior were not deterred." *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *accord Asa–Brandt, Inc. v. ADM Investor Serv., Inc.,* 344 F.3d 738, 747 (8th Cir.2003).

As the record makes clear, the harm suffered by the aggrieved women was severe and persistent. In addition to the immediate humiliation that the women experienced upon being harassed, they continue to suffer from emotional distress and feelings of insecurity and hopelessness. Moreover, there is little doubt that but for this lawsuit, the Veals would have continued harassing other women unfortunate enough to rent homes from them. In spite of numerous complaints, the women in this case were continually victimized by Mr. Veal's harassment and Mrs. Veal's indifference. Complaints did not deter the Veals, perhaps a sizeable damages award will.

■ Notwithstanding the overwhelming evidence of harm, both actual and potential, the Veals argue that the damages award in this case is *per se* unconstitutional because the ratio between the punitive and compensatory damages exceeds nine to one. While the Supreme Court has stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages...will satisfy due process," *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513, the Court has nevertheless repeatedly declined to impose a bright-line ratio which a punitive damages award cannot exceed, *Gore,* 517 U.S. at 582–83, 116 S.Ct. 1589; *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513. Indeed, the *Gore* Court recognized that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore, supra,* at p. 582, 116 S.Ct. 1589. "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.*

Here, the ratio between the punitive and compensatory damages is 22 to 1.[3] Though exceeding a single digit ratio, given the relatively low compensatory award, the reprehensibility of the Veals' acts, and the fact that the harm suffered was primarily noneconomic, the Court finds that the 22 to 1 ratio is reasonable. *See also TXO,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (affirming a punitive award 526 times the amount awarded in compensatory damages); *U.S. v. Big D,* 184 F.3d 924 (8th Cir.1999) (upholding 100 to 1 ratio—$100,000 in punitives, $1,000 in compensatories—in Fair Housing Act case); *Lincoln v. Case,* 340 F.3d 283 (5th Cir.2003) (awarding $55,000 in punitives and $500 in compensatories—110 to 1 ratio—in Fair Housing Act case); *Mathias v. Accor Econ. Lodging, Inc.,* 347 F.3d 672 (7th Cir.2003) (approving 37.2 to 1 ratio award).

Lastly, under the third guidepost, the Court considers the sanctions authorized or imposed in comparable cases. The Fair Housing Act allows courts to impose a civil penalty for certain violations of the Act. 42 U.S.C. § 3614(d); *Big D,* 184 F.3d at 933. The civil penalty shall not exceed $55,000 for a first-time offense, and $110,000 for a subsequent violation. 42 U.S.C. § 3614(d)(1)(C). In this case, the jury found that eleven women suffered sexual harassment at the hands of the Veals. Each of the defendants, therefore, could have faced $605,000 in civil penalties ($55,000 multiplied times eleven). Together the defendants could have faced $1,210,000 in penalties, an amount that is actually more than was awarded against them ($1,102,804). Because the Veals faced more in civil penalties than was awarded by the jury, the final guidepost weighs in favor of the Government.

After applying the three guideposts enunciated in *Gore* and *State Farm,* the Court holds that the punitive damages award is not unconstitutionally excessive. The Court recognizes that the punitive damages award in this case is large. However, the Court also recognizes that the jurors, as witnesses to the emotional testimony of the victims, were in the best possible position to measure the harm committed by the Veals—something that cannot be fully conveyed by a reading of the transcript. In the Court's view, the damages award reasonably reflects that measurement.[4]

### D. Liability of Jewel Veal

 The Veals argue that Jewel Veal cannot be held liable for the conduct of her husband. The argument is that Mrs. Veal did not directly sexually harass the eleven aggrieved women and, therefore, cannot be subjected to the jury's award of compensatory and punitive damages as a matter of law. The Veals fail to direct this Court to

---

**3.** The Court arrived at the 22 to 1 ratio by comparing the aggregate punitive damages award ($1,055,000.00) to the total awarded in compensatories ($47,804.00). Even though the monetary judgment will eventually be paid to the eleven aggrieved women in varying amounts, there is only *one* plaintiff in this case—the United States of America. It is therefore appropriate to view the punitive and compensatory damages collectively. *See United States v. Big D Enter., Inc.,* 184 F.3d 924, 933 (8th Cir.1999) (aggregating the punitive and compensatory damage awards in

Fair Housing Act case involving multiple defendants and multiple "aggrieved persons").

**4.** The Veals also argue that the punitive damages award runs afoul of Eighth Circuit case law because the award exceeds one-half of the Veals' annual income and a quarter of their net worth. The Veals presented no evidence at trial of their income or net worth. This argument has therefore been waived. *Grabinski v. Blue Springs Ford Sales, Inc.,* 136 F.3d 565, 570–71 (8th Cir.1998).

any relevant binding case law in support of their position. In any event, the Court rejects the argument, for the record is clear that Jewel Veal had personal knowledge of her husband's harassing conduct towards their female tenants. At trial, Jewel Veal admitted that she had received written notification of complaints of female tenants, including separate complaints made years apart by two women to the United States Department of Housing and Urban Development. Transcript at pp. 387–88, 394–95. Mrs. Veal also testified that she received written notifications from the Kansas City Human Relations Bureau stating that reasonable cause determinations had been made on two separate harassment complaints. *Id.* at 390–91, 397–98. Notwithstanding the complaints and the reasonable cause determinations, Mrs. Veal testified that she did nothing to prevent her husband from harassing their female tenants. *Id.* at 399. Quite to the contrary, Mrs. Veal, as noted, seems to have regarded the complaining victims as "bitches trying to get free rent and trying to get somewhere, get out of paying rent." *Id.* at p. 141. Thus, in view of the record, including her own testimony, it was not unreasonable for the jury to infer that Jewel Veal acquiesced in and, arguably, even supported her husband's egregious conduct. *See United States v. Balistrieri,* 981 F.2d 916, 930 (7th Cir.1992).

Furthermore, even if Mrs. Veal did not have direct knowledge of all of her husband's conduct, she cannot shield herself from liability for harassment that occurred at rental properties owned jointly by her and her husband and managed for their joint benefit. *Alexander v. Riga,* 208 F.3d 419, 432–34 (3rd Cir.2000) (holding that, under the Fair Housing Act, owner of apartment building may be held vicariously liable for discriminatory acts committed by co-owner); *Walker v. Crigler,* 976 F.2d 900, 904–05 (4th Cir.1992) (same).

For these reasons, the Court holds that Jewel Veal can lawfully be held liable for the harassment of the aggrieved women.

### E. *The Government's Standing to Sue*

■ The Veals' final argument is that the United States of America does not have standing to bring a cause of action under the Fair Housing Act. The argument is wholly without merit. 42 U.S.C. § 3614(a) expressly authorizes the Attorney General of the United States to bring suit for a violation of the Act. When the Attorney General does so, the United States of America is the named plaintiff. *See, e.g., United States v. City of Jackson, Mississippi,* 359 F.3d 727 (5th Cir.2004); *United States v. City of Hayward,* 36 F.3d 832 (9th Cir.1994); *United States v. Oak Manor Apartments,* 11 F.Supp.2d 1047 (W.D.Ark.1998); *United States v. Habersham Prop., Inc.,* 319 F.Supp.2d 1366 (N.D.Ga.2003).

### III.

For the foregoing reasons, the Court denies Defendants' motion for new trial, or in the alternative, motion for relief from judgment, or in the alternative, motion for remittitur or reduction in judgment.

IT IS SO ORDERED.