**Kayla WEST, Plaintiff,**

**v.**

**DJ MORTGAGE, LLC, Defendant.**

**CIVIL ACTION NO. 1:15–CV–397–AT**

United States District Court,
N.D. Georgia, Atlanta Division.

Signed September 14, 2017

---

Jesse M. Centrella, Rebecca Houlding, Giselle Brianceschi Schuetz, Friedman & Houlding, LLP, Janet Elizabeth Hill, Hill & Associates, P.C., Kristine Orr Brown, Orr, Brown & Billips, LLP, for Plaintiff.

John Anthony Christy, Andrew John Lavoie, Schreeder Wheeler & Flint, LLP, for Defendant.

## ORDER

Amy Totenberg, United States District Judge

In this lawsuit, Plaintiff Kayla West, a former tenant at one of Defendant DJ Mortgage, LLC's ("DJ Mortgage") properties, claims that Defendant's property manager sexually assaulted and harassed her over several months. She sued DJ Mortgage under the Fair Housing Act of 1968 ("FHA") as amended, 42 U.S.C. § 3601, *et seq.*, and also under Georgia's negligence doctrine. Previously, the Court denied Defendant's motion to dismiss this case for failure to state a claim. (Doc. 17). *West v. DJ Mortgage, LLC*, 164 F.Supp.3d 1393 (N.D. Ga. 2016).

This case is now before the Court on DJ Mortgage's Motion for Summary Judgment (Doc. 39). DJ Mortgage argues that Ms. West cannot prevail on either of her two FHA claims, and therefore the Court should decline jurisdiction over her remaining state-law claim. The Court **GRANTS IN PART** and **DENIES IN PART** the motion for the reasons set forth below.

## I. FACTUAL BACKGROUND

The following summary of the facts is provided solely for context and does not represent factual findings by the Court. The Court notes where some of the facts below are in dispute. And as required at summary judgment, the Court sets forth the facts in the light most favorable to Ms. West, the non-moving party.

### A. Ms. West's Interactions with Mr. Andrews

In the summer of 2013, Ms. West was searching for homes to rent in Conyers and Decatur, Georgia so that she could be closer to her workplace. ("West Depo.,"

Docs. 42-1, 42-2, and 42-3 at 45, 86-87.) Ms. West was also looking for a home that could accommodate her and her four children. (*Id.* at 12-15, 129.) She spotted an ad on Craigslist for a rental home located at 198 Old Mill Way S.W., Conyers, Georgia ("the Property"), which was owned by DJ Mortgage. (*Id.* at 93; "Thompson Depo.," Doc. 44-1 at 166.) Ms. West responded to the ad by sending an email through Craigslist and also by calling the phone number included in the ad. (West Depo. at 93.) She left a voice message at this phone number expressing interest in the Property, and she provided her cell phone number for someone to call her back. (*Id.* at 94-95.) Gene Andrews called her back and said he had received her message. (*Id.* at 95.) Mr. Andrews told Ms. West what the amount of rent was, that a lot of people were interested in the home, and that he would get back to her in a couple of days. (*Id.* at 94.) Mr. Andrews was employed as the property and/or leasing manager for all of DJ Mortgage's properties, which totaled approximately eighty rental properties in Georgia. ("Smithgall Depo.," Doc. 46-1 at 27, 38; Thompson Depo. at 9; West Depo. at 103.)

Several days after the first phone call, Mr. Andrews called Ms. West about the Property. He reiterated that a lot of people were still interested in it, but he said that he could rent it to her if she paid a deposit and filled out an application. He told her to meet him at South DeKalb Mall so she could pay the deposit and fill out the application. (West Depo. at 97-98, 111.)

On August 8, 2013, Ms. West met Mr. Andrews in the parking lot of the South DeKalb Mall. Ms. West had her three youngest children in the car with her. She walked over to Mr. Andrews's car, he handed her a blank application form, and she went back to her car to fill it out. She then gave the completed application to Mr. Andrews along with approximately $1,700

as a deposit. During this exchange, Mr. Andrews described the Property to Ms. West in more detail. He explained that he worked for DJ Mortgage, that he was the property manager, and that she should contact him if she needed anything related to the Property. He also told her that he would be in touch again so she could sign the lease, provide paycheck stubs, and get the keys to the Property. (*Id.* at 110–115.)

On August 9th, Mr. Andrews called Ms. West to schedule a meeting the following day, August 10th, at the Property. He laid out the next steps for the rental to occur during their meeting: Ms. West needed to bring her paycheck stubs, sign the lease, and sign the lead paint form, and Mr. Andrews would then give her the keys. He also told Ms. West something to the effect of "I'm going to need you to give me a hug." Ms. West did not reply to this statement but simply said "thank you" and hung up the phone. She told her boyfriend, Quovadas Pete Foster, about Mr. Andrews's comment to her about needing a hug. (*Id.* at 115–116, 118–121.)

Mr. Andrews called Ms. West on August 10th and asked if she could meet him on Columbia Drive in Decatur instead of at the Property since he had a meeting across town. They agreed to meet in the parking lot of a restaurant on Columbia Drive. She drove with two of her children to the parking lot, and Mr. Andrews came up to her car. He asked her to get in his car to review and sign the remaining paperwork. She went to his car and sat in the passenger side while he sat in the driver's side. He reviewed the lease with her, she signed the lease, he handed her the keys to the Property, and then he told her to read over the lead paint form and sign it. As Ms. West finished signing the lead paint form, Mr. Andrews reached over and raised her skirt and grabbed her vagina. She slapped his hand, left the signed paperwork on the dashboard, and got out of his car and slammed the car door. Mr. Andrews said nothing during this exchange and drove off. When Ms. West returned to her car, her daughters asked her what was wrong. She told them what had happened. She also called Mr. Foster and told him what happened. (*Id.* at 121–29, 137.)

Ms. West and her children moved into the Property on August 11th. When moving in, Ms. West noticed that the air conditioning unit was not working and she called Mr. Andrews about getting it fixed. During the call, Mr. Andrews abruptly told Ms. West that she had a "beautiful skin tone." He then asked if she had a boyfriend, and she replied that she did. He asked how long she had been with her boyfriend, and she said, "Long enough." DJ Mortgage's records show that the air conditioning unit was repaired the following day, August 12th. (*Id.* at 144, 155–56; "QuickBooks," Doc. 47–22 at 2.)

Less than two weeks later, the door to Ms. West's bedroom came off its hinges. She texted Mr. Andrews about it on August 23rd and told him that the screws holding the hinges in place were stripped. Mr. Andrews responded, "Okay." (West Depo. at 147, 151.)[1] Four days passed and no one had come to fix the door. (*Id.* at

---

1. Ms. West has not produced the actual text messages showing that this exchange took place. She instead cites to her deposition testimony where she talks about these August 23rd text messages. The best evidence rule states: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. DJ Mortgage does not raise the "best evidence" objection to Ms. West's deposition testimony here, though it states in a footnote that "[a] screenshot or other reproduction of the native text messages allegedly exchanged by Plaintiff and Andrews on August 23 was never produced to Defendant, despite several other screenshots of text messages being produced by Plaintiff." (Def.'s Motion, Doc. 39–1 at 8 n.

151.) On August 27th, Ms. West texted Mr. Andrews again to tell him that no one had fixed her door. Over text, Mr. Andrews said he would call the repairman, and he followed up to say that the repairman would be at the Property at 9 A.M. He then asked, "Maybe I can take you to lunch are [sic] breakfast soon?" ("Texts," Doc. 47–11 at 2–3.) Ms. West did not respond to this text. The door was fixed shortly afterward. (West Depo. at 151–52.)

On August 29th, Ms. West texted Mr. Andrews about additional problems she was experiencing with the Property that needed repair. (Texts at 3; West Depo. at 153–54.) She mentioned a burst pipe, a dishwasher and a refrigerator in need of repair, and moldy carpet. (West Depo. at 160–63; "Pl.'s Interrogatory Responses," Doc. 47–28 at 16.)[2] Mr. Andrews responded by calling Ms. West. They discussed the issues needing repair, and Mr. Andrews said he would look into getting another refrigerator for her. He then asked if she had given any thought to going out with

him. Ms. West replied, "No. I have a boyfriend." (West Depo. at 161–63.)

Two days later, on August 31st, a repairman came to the Property. According to DJ Mortgage's invoices, the repairman "check[ed] [the] leak behind [the] washroom wall." ("Invoices," Doc. 47–21.) He replaced the "wash box and busted pipes," "cut sheet rock" and replaced it, and painted. (Id.) DJ Mortgage's invoices do not show that the repairman fixed or replaced the refrigerator or the moldy carpet. (See id.)

Around this time, Mr. Andrews told Ms. West she should leave a key for him in case he needed to access the Property. Ms. West never left a key for Mr. Andrews during her stay at the Property because she felt threatened by his sexual advances towards her. ("West Declaration," Doc. 47–20 ¶ 4.)

On September 11th, Ms. West texted Mr. Andrews again to complain about the unfixed problems.[3] (West Depo. at 166–

37.) The parties have not had the opportunity to fully brief this issue, as DJ Mortgage briefly raised the issue in a footnote, did not explicitly make a "best evidence" objection, and "assume[d] without admitting" that Ms. West's restatement of the August 23rd text conversation could be considered at summary judgment. The Court will consider Ms. West's position before ruling definitively on the issue, as the Best Evidence rule may not apply here or alternatively may possibly be used as appropriate secondary evidence of the text messages so long a Plaintiff did not delete or destroy the text message in bad faith. *United States v. Holland*, 223 Fed.Appx. 891, 897–98 (11th Cir. 2007); *United States v. Ross*, 33 F.3d 1507, 1513–14 (11th Cir. 1994); *Centennial Bank v. Servisfirst Bank Inc.*, No. 8:16-cv-88-T-36JSS, 2016 WL 4238766, at *2 (M.D. Fla. 2016). For purposes of this motion, then, the Court considers Ms. West's testimony about the August 23rd text exchange as evidence that may be reducible to an admissible form at trial.

**2.** This is another instance where Ms. West has not produced the entire text message refer-

enced here. She produced only a portion of the August 29th text that she sent to Mr. Andrews: "I don't know [sic] what to say but ever since I moved in here its problems after next now the back room wall and carpet is." The snapshot of the message does not show the remainder of the message. Thus, Ms. West relies on her deposition testimony about August 29th text message to describe the content of the message. As with the August 23rd text exchange, DJ Mortgage briefly raised the issue in a footnote, did not explicitly make a "best evidence" objection, and "assume[d] without admitting" that Ms. West's restatement of the August 29th text conversation could be considered at summary judgment. Thus, for this motion, the Court considers Ms. West's testimony about the August 23rd text exchange as evidence that may be reducible to an admissible form at trial.

**3.** This is another instance where Ms. West has not produced the September 11th text message referenced here. DJ Mortgage treats this issue in the same way it treated the August 23rd and August 29th messages. Accordingly,

67.) She spoke with Mr. Andrews on the phone that same day about these issues. (*Id.* at 166.) Around two days later, a repairman came to the Property and replaced her refrigerator with a used refrigerator. Additionally, the repairman removed a portion of the wet carpet and replaced a leaking drain pipe and shut off the valve. (Invoices, Doc. 47–21 at 4.)

On September 14th, Ms. West texted Mr. Andrews about mites in her carpet that were biting her and her children.[4] Mr. Andrews responded by calling Ms. West. He questioned her assessment of the situation by asking how she knew the problem was mites and asking if she had dogs. (West Depo. at 168–69.)

About a week later, the mite-infested carpet at the Property was replaced. (West Depo. at 170.) On September 21st, Ms. West texted Mr. Andrews to thank him. (*Id.*) Mr. Andrews responded via text, "You [sic] welcome. Maybe I can come get my pic[.]" (Texts at 4.) This was not the first time Mr. Andrews had asked Ms. West for a "pic." During prior telephone conversations, he had asked her to send him "nude" and "naked" pictures. He had asked questions over the phone such as "When can I come by and get that pic," and sometimes he made these requests for pictures in return for performing repairs for her. He had also asked her over the phone to "give him a call sometime" and suggested that it was about something other than the Property. (West Depo. at 179–80, 193–94, 226.) Ms. West could not recall

exactly when these phone conversations took place, but she believed they took place before the September 21st text exchange. (*Id.* at 179, 193.)

Upon receiving Mr. Andrews's text on September 21st, Ms. West showed the text to her boyfriend, Mr. Foster, and said something to the effect of, "There he goes. He's texting me." (*Id.* at 183–84.) Mr. Foster had grown suspicious of the situation since Ms. West had been confiding in him about her exchanges with Mr. Andrews, starting with Mr. Andrews asking for a hug on August 9th and then grabbing her vagina on August 10th. (*Id.* at 120–21, 137, 184, 187; "Foster Depo.," Docs. 50–1 and 50–2 at 132–33.) When Ms. West handed Mr. Foster her phone to show him Mr. Andrews's text, Mr. Foster began to text Mr. Andrews back without disclosing who he was or that it was someone other than Ms. West texting. (West Depo. at 183–85.) The text exchange then unfolded as follows, with Mr. Foster pretending to be Ms. West:

Andrews: You welcome. Maybe I can come get my pic

West: Which one?

Andrews: The where [sic] I can see all that sexiness

West: You already saw me in person. . .lol

Andrews: You got down

West: Huh . . .

Andrews: You are right

---

for the reasons discussed in footnote 1, the Court considers Ms. West's testimony about the September 11th text exchange as evidence that may be reducible to an admissible form at trial.

4. While Ms. West has not produced the September 14th text message referenced, DJ Mortgage does not raise an issue about the production of this text message. DJ Mortgage does object in its Response to Plaintiff's State-

ment of Additional Material Facts that Ms. West is attempting to use hearsay to prove what actually occurred at the property, but this should be a non-issue at trial since Ms. West can testify herself about what occurred at the property without having to rely on the text messages. The Court thus considers Ms. West's testimony about the September 14th text exchange as evidence that may be reducible to an admissible form at trial.

Andrews: Just hoping there was something else I could see?

West: Like what

Andrews: We should really talk in person

West: K

(Texts at 4–6.)

Throughout this exchange, Ms. West was sitting next to Mr. Foster as he was texting. Mr. Foster told her what he had texted Mr. Andrews and also what Mr. Andrews was texting in response. Ms. West did not tell Mr. Foster what to text in this exchange; Mr. Foster wrote the texts on his own. In particular, when Mr. Andrews texted "You got down," Mr. Foster read this text to Ms. West and she told him she did not know what Mr. Andrews was talking about. He also read her Mr. Andrews's next response—"You are right"—and she told Mr. Foster again that she did not know what Mr. Andrews meant by this. Ms. West never sent nude pictures to Mr. Andrews, nor did she speak to him in person as he had requested. (West Depo. at 183–90; West Declaration ¶ 2.)

On September 27th, Ms. West's replacement refrigerator broke, which caused all of her groceries in the refrigerator to spoil. She texted Mr. Andrews that the refrigerator was broken and had caused her food to spoil, and she added, "I will replace it if I have to cause I can't lose money on food like this." Mr. Andrews simply replied, "Do what you have to do." Ms. West replied, "I will thank you so much." (Texts at 6–7.) Ms. West understood this response to mean that Mr. Andrews was refusing to repair the refrigerator. Recently, she had noticed that he was becoming agitated when she raised complaints about the Property. (West Depo. at 202.) Ms. West deducted her expenses for the spoiled food from her rent. (*Id.* at 262–63.)

Around the same time, the furnace at the Property stopped working, and Ms. West called Mr. Andrews to tell him about it. He told her she had too many complaints, and that he could get her out of the Property and rent it to someone who had fewer complaints. (*Id.* at 172, 175–77.)

Over the next several weeks, Mr. Andrews did not repair the heat or the refrigerator. Ms. West felt that Mr. Andrews's refusal to make further repairs on the Property was the result of her not complying with his requests for nude pictures or to go out with him. (*Id.* at 177, 224–25, 262–63.)

On October 21st, Ms. West sent a letter to DJ Mortgage via certified mail. The letter reads as follows:

I'm writing DJ mortgage to inform you of a big problem I'm having with your landlord Gene (not sure of last name) but I've lived here 2 months and had nothing but problems that was not my fault and out of my control, such as the A.C unit stop working, the toilet in the master bedroom was not useable and kitchen sink pipe busted and water damage to the carpet in the family room which I now have mold in my walls and my son is asthmatic which I explain to Gene already. Yes they did come and change the carpet because it had mites in it and me and my family was getting biting alive by them. Not only that I had pay to fix the refrigerator and replace grocery and the water in my bathroom is still running that my water bill went from $46.00 to $250.00 because of this. I'm a single mom of four, and when I told gene about it all I got was to do what I got to do, that he stated can't help my problems in my home because he did enough already and that he can get someone else to rent this home. So basically it's saying if I complain of another problem I can be removed. So I've been having a lot of problems but afraid to call him, because I might not have a

roof over my head for me and my kids. As I'm writing you me and my kids are in the cold because the heat don't work and I don't think this is right, also my dishwasher caught on fire I have the video for that and the mold.

Now there is a bigger problem, before I moved into your property I was asked by gene to give him a hug, which I brushed off, and then I started to get text messages from him asking for naked pictures of me, asking me out and stating that he will come to my home to get them (naked pictures)....And August 10 2013 I had to meet up with Gene in Decatur on Columbia drive to bring my check stubs and get my lease from him. and as I was sitting in his passenger set (sic) waiting on my lease, he touched me and raise up my skirt which I pushed his hands away from me. And every time he did something to my home he asked for naked picture or asked to talk privately on the phone which I did not respond. so I'm afraid of being homeless because I did not give in to his actions, everything that's been going on I've become stressed with anxiety and panic attacks which I never had a health problems before, my boyfriend seen these texts and thought I had something going on with the landlord that but a strain in our relationship also.

Now I feel that because I did not entertain his advances and sexual harassment he is giving me a hard time, so I do not contact him for anything of the fear of being without a home. And on this note I will be taking civil action and contacting HUD fair Housing and will be in contact with my attorney. Because no one should have to live this way, it's wrong.

I'm in the cold with me and my kids right now this is ridiculous

("October 21st Letter," Doc. 47–12; West Depo. at 224.)

On October 24th, Mr. Andrews texted Ms. West and told her to call him about the heat.[5] Approximately one month had passed since Ms. West asked Mr. Andrews to fix the furnace in late September. During this time, Ms. West had not communicated with him again about the furnace not working, and Mr. Andrews had not done anything to fix it. Additionally, Ms. West had someone come to the Property to look at her furnace, and the person told her that the electrical panel needed to be changed. On the 24th, Ms. West and Mr. Andrews discussed her broken furnace. At one point, Mr. Andrews stated that the furnace was gas-powered, not electric. Ms. West knew this was incorrect based on the earlier assessment of her furnace as needing a new electrical panel, and also based on Mr. Andrews's statements to her during the application process that everything in the home was electric. (West Depo. at 251–52, 301–06.) After their text exchange on the 24th, Mr. Andrews did not send anyone to repair the furnace. (*Id.* at 305–08.)

DJ Mortgage does not present any evidence showing that the interactions and conversations described by Ms. West up to this point—including Mr. Andrews grabbing Ms. West in the car and the text messages and phone calls between the two of them—did not occur. Instead, DJ Mortgage highlights inconsistencies in Ms. West's evidence and characterizes her account of some events as "grossly exagger-

---

5.  DJ Mortgage objects to the Court considering the October 24th text exchange based on admissibility. Specifically, DJ Mortgage argues that Ms. West has not complied with the best evidence rule (Fed. R. Evid. 1002) by failing to produce the actual text messages and instead referencing Ms. West's testimony about the text messages. For the same reasons as were discussed in footnote 1, the Court will for now consider Ms. West's testimony about the text exchange as evidence that may be reducible to admissible form at trial.

ated." ("Def.'s Motion," Doc. 39–1 at 24.) For example, Ms. West stated in an interrogatory response that Mr. Andrews attempted to hug her at one point, but she later stated in her deposition that this never happened. (Pl.'s Interrogatory Responses at 16; West Depo. at 197.) She stated in the Complaint that she was coerced to provide sex in exchange for repairs, but she admitted in her deposition that Mr. Andrews never asked her for sex. ("Compl.," Doc. 1 ¶ 40; West Depo. at 203.) Additionally, DJ Mortgage points out particular responses given in Ms. West's deposition that might bear on the credibility or veracity of her complaints. For instance, Ms. West stated that she "brushed off" Mr. Andrews's comment about hugging her and stated she "ignored him" when he grabbed her in his car (West Depo. at 119–20, 137); that Ms. West still moved into the property the day after Mr. Andrews grabbed her and did not contact anyone at DJ Mortgage about it then (Id. at 137, 144, 146); and that she and Mr. Andrews only had two in-person encounters during her tenancy.[6]

## B. DJ Mortgage's Interactions with Ms. West After Receiving Her Allegations of Sexual Harassment

The evidence is disputed as to how DJ Mortgage responded to Ms. West's October 21st letter in the days and weeks after receiving it. The Court begins with Ms. West's account of the facts and later notes where DJ Mortgage disputes certain facts.

Ms. West testified that after she sent the October 21st letter to DJ Mortgage, she did not hear from DJ Mortgage until approximately November 14th or 15th. (West Depo. at 237.) At that time, she received a Notice to Pay or Quit and also a separate letter from Christopher Willis, an attorney for DJ Mortgage, in the mail. ("Martinello Depo.," Doc. 45–1 at 145; West Depo. at 238–39.)

With respect to the Notice to Pay or Quit, Ms. Martinello, DJ Mortgage's Office Manager and Financial Controller, was instructed on November 14th by either Mr. Andrews or Mr. Andrews's supervisor, Will Thompson, to send the notice to Ms. West. (Martinello Depo. at 130.) Ms. West had paid the monthly rent that was due through October 2013, but she had not paid rent that was due by November 5, 2013. (West Depo. at 263; Thompson Depo. at 42.) The Notice to Pay or Quit was a form letter that Ms. Martinello would prepare and send to tenants who were behind on rent. (Martinello Depo. at 145–46, 148.) Ms. Martinello characterized the Notice to Pay or Quit as the first step in the eviction process and that it lets the tenant know that eviction is an option. (Id. at 145–46.) Normally, Mr. Andrews would authorize the notice and include his name on it. (Thompson Depo. at 170–71.) Mr. Andrews also had authority to carry out the eviction process from start-to-finish, starting with the issuance of the Notice to Pay or Quit. (Id. at 171–72.)

Mr. Willis's letter was dated November 15, 2013 and states the following:

I represent DJ Mortgage, LLC, the owners of the property located at 198 Old Mill Way, Conyers, Georgia. I understand that you brought to my clients' attention certain issues that you are having in the above—referenced residence. My client has attempted to contact you and discuss the situation but has not received any response from you. My client wants you to know that they take your complaints seriously and are willing to engage in dialogue with you in an

---

6. Defendant also argues that the September 21st text exchange with Mr. Andrews was really just a ruse concocted by Ms. West and her boyfriend, and not something that Ms. West took seriously. (Id. at 182–83).

effort to resolve any problems. If you still wish to speak with my client about this matter, please contact Will Thompson with DJ Mortgage at 404–814–1644 ext. 105.

("Willis Letter," Doc. 47–24.)

In response to Mr. Willis's letter, which provided Mr. Thompson's contact information, Ms. West called Mr. Thompson several times and left a message for him to call her back. She was not able to reach him, and he did not call her back. (West Depo. at 239.)

On November 18th, Ms. West wrote a letter to Mr. Thompson:

I'm writing you to inform you that I did try to reach you on several occasions; I also left a message to return my call. The reason I'm writing you is to inform you of things that I had to do so keep my family warm for this cold season. I had to have someone to come out to check my heating problem and I was told I needed a new furnish [sic], also code enforcement will be coming to my home for this issue and no screens on windows and windows that can't open, which is a hazard. I repaired the refrigerator before and it's out again, my plumbing needs to be fixed I will attach receipt for this, I was told that the water pressure is high and this is the reason my water bill is sky high.....By me having to get heaters for my home and high water bill this is putting a burden on my finances and not including the stress.

Also the mold is still in my home, I was told by gene [Andrews] they were going to fix and replace wall. And because of the mold my son is getting sicker and having nose please [sic] and constant asthma attacks (which I have Dr. Note to explain better) and my daughter is having severe headache now. But you guys were already aware of this. At-

tached are receipts of the above stated problems.

("November 18th Letter," Doc. 47–13; West Depo. at 239.)

On November 22nd, Ms. West filed a complaint with the Georgia Commission on Equal Opportunity ("GCEO") against DJ Mortgage and Mr. Andrews. She alleged that Mr. Andrews had been "sexually harassing" her, and she described some of her interactions with Mr. Andrews and the issues she was having with the Property. ("GCEO Complaint," Doc. 47–20.) Subsequently, Ms. Martinello at DJ Mortgage received a copy of Ms. West's GCEO complaint in the mail. Ms. Martinello described the GCEO complaint and Ms. West's previous letter to DJ Mortgage on October 21st as "pretty much the same." (Martinello Depo at 148–49, 183–84.)

Sometime during the first week of December, Ms. Martinello called Ms. West and spoke with her for the first time. Ms. Martinello asked Ms. West to come to DJ Mortgage's office for a meeting. (West Declaration ¶ 3; West Depo. at 240–41.) Ms. Martinello expressed that DJ Mortgage would like to see the text messages involving Mr. Andrews that Ms. West had referenced in her letter. (West Depo. at 240.) Ms. West could not meet on the day that Ms. Martinello requested. (Id. at 240–41.) She asked if she could speak to DJ Mortgage by phone instead of meeting in person to discuss the issues in the October 21st letter. Ms. Martinello told her that Mr. Thompson really wanted to speak to Ms. West in person. ("Martinello Email to Thompson," Doc. 47–32.) Ms. West and Ms. Martinello then scheduled the meeting for December 11th. (West Depo. at 240–41.)

DJ Mortgage disputes several facts in Ms. West's account as stated above. In particular, DJ Mortgage claims that its employees took steps to respond to Ms.

West's October 21st letter within days of receiving it. Ms. Martinello testified that she called Ms. West on or about October 28th and spoke with Ms. West. Ms. Martinello further testified that she informed Ms. West that DJ Mortgage had received her letter, that she asked Ms. West to come into the office to discuss the matters she had raised in the letter, and that Ms. West had agreed to call back and let her know when she could come in. According to Ms. Martinello, she did not hear from Ms. West until November 18th. (Martinello Depo. at 129–30.) Ms. West called Ms. Martinello on November 18th and said she could come into the office the next week, but Ms. West then canceled and rescheduled this appointment twice. (*Id.* at 130–31.) DJ Mortgage does not dispute that, in the meantime, Ms. Martinello had sent the Notice to Pay or Quit to Ms. West and Mr. Willis (the attorney) had sent a letter to Ms. West on or around November 14th or 15th. (Def.'s Motion, Doc. 39–1 at 16 n. 74; "Def.'s Reply," Doc. 52 at 14.) On December 5th, according to Ms. Martinello, Ms. West called her and said she could come in that day at 1:00 P.M. Later that day, Ms. West called and rescheduled for December 11th, saying that the person who was supposed to replace her at work had not shown up. (Martinello Depo. at 130–32.)

The following facts are in less dispute, though the Court notes those disputes where the parties present conflicting evidence.

On approximately December 5th, Dean Tilman—the overall manager for DJ Mortgage and the supervisor over Mr. Thompson and Mr. Andrews—spoke with Mr. Andrews about Ms. West's allegations. Mr. Thompson also attended this meeting. Mr. Andrews admitted to some inappropriate behavior and that "there was texting going on." ("Martinello Chain of Events," Doc. 47–18; "Tilman Depo.," Docs. 43–1 and 43–2 at 18.) [7]

In the weeks leading up to this December 5th discussion, DJ Mortgage had also discovered that Mr. Andrews had been stealing from the company. He had been collecting tenants' application fees for himself and not delivering them to DJ Mortgage. (Tilman Depo. at 47; Martinello Depo. at 53–54.) Ms. Martinello learned about the theft because a tenant told Ms. Martinello that she had paid an application fee, but Ms. Martinello's records did not reflect this. Ms. Martinello told Mr. Tilman about the issue, and he instructed her to call their most recent tenants and "do some research to make sure that this was an isolated incident." She called tenants and determined that Mr. Andrews had stolen application fees from several other tenants as well. Ms. Martinello was investigating Mr. Andrews's theft around the same time that she was scheduling a meeting with Ms. West regarding her allegations against Mr. Andrews. (Martinello Depo. at 56–59, 63–65.) No one at DJ Mortgage called other tenants to determine if they had experienced sexual harassment by Mr. Andrews similar to what Ms. West had experienced. (*Id.* at 112.)

DJ Mortgage fired Mr. Andrews on approximately December 5, 2013. (Martinello

---

7. Ms. Martinello's "chain of events" document presents potential hearsay concerns. To the extent that Ms. West wants to cite to the contents of this document as evidence, the evidence is admissible hearsay as an opposing party's statement. However, to the extent DJ Mortgage wants to rely on the contents of this document, the Court is concerned that the document may not be admissible for this purpose. For instance, it does not appear to fall within the "recorded recollection" exception because Ms. Martinello testified that she did not update or edit this document contemporaneously with the events as they occurred. (*See* Fed. R. Evid. 803(5); Martinello Depo. at 138.). The Court does not exclude this evidence for purposes of the current motion but merely flags the issue for future proceedings.

Depo. at 138–39.) Until this point, Mr. Andrews had continued to serve as property manager for DJ Mortgage. (*Id.* at 163–64; Thompson Depo. at 129.) It is unclear the extent to which, if at all, Mr. Andrews continued serving as property manager for Ms. West's apartment after her October 21st letter to DJ Mortgage. Mr. Smithgall—an agent for one of the owners of DJ Mortgage—testified that he had a discussion with Mr. Thompson and "somehow it was decided that [Mr. Andrews] should not be dealing with [Ms. West] immediately on any basis." (Smithgall Depo. at 55.) But Mr. Thompson, and also Ms. Martinello, both testified that they could not recall whether Mr. Andrews remained the property manager for Ms. West's apartment before he was fired. (Martinello Depo. at 163–64; Thompson Depo. at 49–51, 129.) Ms. West further testified that Mr. Andrews contacted her via text as late as October 24th regarding her furnace issues. (West Depo. at 250–51.) DJ Mortgage disputes that this text ever happened and asserts that there is no admissible evidence to support it. (Def.'s Motion, Doc. 39–1 at 15 n. 71.) Nevertheless, there is no evidence that DJ Mortgage's employees contacted Ms. West to inform her that Mr. Andrews was no longer serving as her property manager or that she should contact Mr. Thompson instead regarding repairs or other requests.

On December 9th, Ms. West emailed Mr. Thompson:

> I have sent you letters and via email of my home not having heat, I have for kids that's getting sick and missing school for this, you want me to come to your office to talk face to face I understand but with out heat in this weather is not rite. 54 is the room temperature in my home this a.m. this is inhumane for a person to have to deal with especially with kids in the home.

Mr. Thompson responded that day: "What address are you at and phone number[?]" Ms. West emailed him her address and phone number. ("West Emails to Thompson," Doc. 47–23 at 2.)

On December 11th, Ms. West emailed Mr. Thompson again:

> This is my home temp! Do you no how it is to freeze? It's like me and my kids are living outside in the cold, this is unreal. I don't understand why. This is misery.

She attached a picture of her thermostat displaying the number "46." (*Id.* at 3.) As of December 11th, before DJ Mortgage employees met with Ms. West in their office, DJ Mortgage had not fixed Ms. West's furnace issue since receiving her October 21st letter. (Thompson Depo. at 62, 111.)

That same day, December 11th, Ms. West met with Ms. Martinello, Mr. Thompson, and Mr. Tilman at DJ Mortgage's office, and they were joined by Ms. West's son and her boyfriend, Mr. Foster. Ms. West showed them text messages from Mr. Andrews until her phone died. Mr. Thompson then asked her if she was going to continue paying rent. (West Depo. at 242–46.) Ms. West responded to the effect of, "Yes. Once everything is fixed in my home." (*Id.* at 246.) Accordingly, DJ Mortgage agreed to make the repairs she requested, and Ms. West agreed to pay rent by the end of December. (Thompson Depo. at 109–110.) Ms. West had not paid rent for November or December at that point. (QuickBooks, Doc. 47–22 at 2; West Depo. at 263.)

Following the meeting that day, DJ Mortgage sent a heating and air company to the Property to repair the furnace. However, two to three days afterward, the furnace broke again and only blew cold air. Ms. Martinello called Ms. West to inquire about the repairs, and Ms. West told her that the furnace broke again. Ms. Marti-

nello said she would tell Mr. Thompson and get back to Ms. West. Nobody contacted her again about fixing the furnace, and nobody came to fix the furnace after that.[8] (West Depo. at 307–09.)

Additionally, sometime shortly *after* the December 11th meeting, DJ Mortgage notified Ms. West for the first time via letter that Mr. Andrews was no longer employed there. (*Id.* at 247.)

On December 13th, Ms. West emailed Mr. Thompson stating that she would be filing a criminal complaint against Mr. Andrews and also seeking a protective order against him. She stated that she feared Mr. Andrews would retaliate against her because he was fired. (West Emails to Thompson at 4.)

On December 19, 2013, Mr. Thompson sent Ms. West a Notice to Pay or Quit on behalf of DJ Mortgage. The notice stated that DJ Mortgage would file a dispossessory action against Ms. West on December 27, 2013 if she had not delivered rent payments for November and December as well as late fees. It also stated that DJ Mortgage was "aware of [Ms. West's] GCEO complaint, but that does not excuse [her] from paying rent per the lease." ("December Notice to Pay or Quit," Doc. 47–19.)

Over the next several months up to the beginning of April, DJ Mortgage did not

repair the furnace at the Property. (West Depo. at 264, 269, 309.) Ms. West continued not to pay rent during this time. (QuickBooks, Doc. 47–22 at 2; West Depo. at 263.) On April 4, 2014, Ms. West entered into a dispossessory consent judgment with DJ Mortgage. The judgment stated that Ms. West would vacate the Property by May 15, 2014 and pay DJ Mortgage $2,800. ("Dispossessory," Doc. 47–26.) Ms. West vacated the property in May 2014. (*Id.* at 281.) Additionally, the GCEO closed its investigation into Ms. West's complaint due to the consent judgment. ("GCEO Closure Emails," Doc. 47–31.)

At the time that Ms. West left the Property, DJ Mortgage did not have a written policy prohibiting its employees and agents from engaging in sexual harassment or sex discrimination. It simply had a verbal policy "to comply with the laws." (Smithgall Depo. at 96.) Nor did DJ Mortgage have a written policy on how to investigate complaints of sexual harassment. (Tilman Depo. at 9–10.) It also did not provide formal training to its employees or agents regarding sexual harassment or sex discrimination. (Thompson Depo. at 133, 144–45; Tilman Depo. at 55–56.) There were no provisions in DJ Mortgage's application or lease agreement prohibiting sexual harassment or sex discrimination, nor were there any provisions stating the measures that tenants could take if they were subject to

---

**8.** DJ Mortgage disputes this fact by citing to Mr. Thompson's testimony, where he states that Ms. West "didn't mention anything else outside of the dishwasher and the thermostat [at the December 11th meeting], and that's what we took care of as of that day." (Thompson Depo. at 111.) But Mr. Thompson also testifies that he did not remember whether or not he received another complaint from Ms. West about her heat, and he did not recall Ms. Martinello telling him that Ms. West's heat had broken again after December 11th. He goes on to state that there were no additional repairs to the heat after December 11th. (*Id.* at 112.) Additionally, Ms. Martinello testifies

that she does not recall whether Ms. West made additional complaints about the heat after the December 11th meeting or whether someone was sent to repair the heat after the meeting. (Martinello Depo. at 172–73.) Mr. Thompson's and Ms. Martinello's lack of memory about the ongoing heat issues with Ms. West's property arguably does not constitute competent evidence contradicting Ms. West's evidence that there were such ongoing issues. Even viewing this testimony as creating a disputed fact, the Court must construe this evidence in the light most favorable to Ms. West at summary judgment.

such harassment or discrimination. (Tilman Depo. at 58–60.)

## II. LEGAL STANDARD

This Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## III. DISCUSSION

Ms. West has sued DJ Mortgage for violating the Fair Housing Act ("FHA") and the state-law negligence doctrine. Under the FHA, Ms. West brings two sex discrimination claims based on sexual harassment as well as a claim for unlawful interference with her protected FHA rights. Specifically with respect to sex discrimination, she brings a "hostile housing environment" sexual harassment claim and a "quid pro quo" sexual harassment claim. She claims that DJ Mortgage is liable under these two claims because its employee, Mr. Andrews, sexually harassed her and conditioned sexual favors in exchange for providing her repairs. With respect to unlawful interference, she claims that DJ Mortgage interfered with her protected rights by failing to make repairs and evicting her because she complained about Mr. Andrews's sexual harassment of her.

DJ Mortgage now moves for summary judgment only on the FHA claims, not the negligence claim. If the Court grants its motion, DJ Mortgage asks the Court to decline to exercise supplemental jurisdiction over the remaining state-law negligence claim and to dismiss it without prejudice. For purposes of this motion, then, the Court only assesses the merits of Ms. West's FHA claims.

### A. Sex Discrimination Claim

The FHA prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of a person's sex. 42 U.S.C. § 3604(b). The FHA also makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the [ ] enjoyment" of their rights under the FHA— such as the right to be free from sex discrimination. 42 U.S.C. § 3617.

DJ Mortgage briefly argues in its motion that sexual harassment does not necessarily qualify as "sex discrimination" under the FHA. Citing to the Eleventh Circuit's decision in *Tagliaferri v. Winter Park Housing Authority*, DJ Mortgage states that there is no binding authority that has specifically held sexual harassment to be actionable under the FHA. 486 Fed.Appx. 771, 774 (11th Cir. 2012). Therefore, it states that Ms. West's claim based on sexual harassment fails as a matter of law.

■ This argument is unfounded for several reasons. While the Eleventh Circuit in *Tagliaferri* declined to decide whether sexual harassment was actionable under the FHA, it nevertheless assumed that such a claim existed when it assessed the sufficiency of a complaint on a motion to dismiss. *See* 486 Fed.Appx. at 774. Moreover, courts (including this one) have consistently held that sexual harassment *is* a form of sex discrimination under the FHA. *See, e.g., Hamilton v. Lanier*, No. CV415-012, 2016 WL 4771091, at *2 (S.D. Ga. Sept. 12, 2016); *Butler v. Carrero*, No. 1:12-cv-2743-WSD, 2013 WL 5200539, at *7 (N.D. Ga. Sept. 13, 2013); *Boswell v. Gumbaytay*, No. 2:07-CV-135-WKW, 2009 WL 1515872 at *5 (M.D. Ala. June 1, 2009); *Richards v. Bono*, No. 5:04CV484-OC-10GRJ, 2005 WL 1065141, at *5 (M.D. Fla. May 2, 2005) (collecting cases that have recognized sexual harassment claims under the FHA); *Krueger v. Cuomo*, 115 F.3d 487 (7th Cir. 1997); *Honce v. Vigil*, 1 F.3d 1085, 1089 (10th Cir. 1993); *see also West v. DJ Mortgage, LLC*, 164 F.Supp.3d 1393, 1398 (N.D. Ga. 2016).[9] The U.S. De-

partment of Housing and Urban Development ("HUD"), the federal agency tasked with administering the FHA, has also attempted to remove all doubt on this issue. HUD issued guidance in 2008 and then a regulation in 2016, both plainly stating that the FHA prohibits sexual harassment as a form of sex discrimination. U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, OPINION LETTER ON QUESTIONS AND ANSWERS ON SEXUAL HARASSMENT UNDER THE FAIR HOUSING ACT (November 17, 2008); 24 C.F.R. § 100.600 (effective October 14, 2016). As the weight of persuasive authority recognizes sexual harassment as actionable under the FHA, the Court rejects DJ Mortgage's argument claiming otherwise.

■ DJ Mortgage dedicates the bulk of its motion to arguing that the evidence does not show that Mr. Andrews's conduct towards Ms. West rose to the level of sexual harassment. Sexual harassment constitutes sex discrimination when it alters the terms or conditions of a tenant's rental of property. *West*, 164 F.Supp.3d at 1398; *Butler*, 2013 WL 5200539, at *7. Courts recognize two types of sexual harassment under the FHA: "hostile housing environment" harassment and "quid pro quo" harassment. *Honce*, 1 F.3d at 1089; *Richards*, 2005 WL 1065141, at *5. Ms. West claims that Mr. Andrews committed both types of sexual harassment against her when serving as her property manager.

### 1. "Hostile Housing Environment" Harassment Claim

■ Hostile housing environment harassment occurs "where the landlord

---

9. In determining that sexual harassment is actionable under the FHA, courts often relied on and analogized to sexual harassment cases arising under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000(e) *et seq. See e.g., Tagliaferri*, 486 Fed.Appx. at 774 (applying Title VII sexual harassment standards to a FHA sexual harassment case when the parties agreed that

sexual harassment under the FHA must be considered sufficiently severe or pervasive like in employment sexual discrimination cases); *see also Butler*, 2013 WL 5200539, at *7 n.13 (stating that in sexual harassment cases under the FHA courts often rely on sexual harassment cases arising under Title VII).

subjects his tenant to sexually hostile behavior of sufficient severity and pervasiveness to alter the terms and conditions of the rental arrangement." *Richards*, 2005 WL 1065141, at *2. Specifically, a plaintiff establishes a claim for hostile housing environment by demonstrating:

> (1) that he or she belongs to a protected group; (2) that the [tenant] has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the [tenant]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of [tenancy] and create a discriminatorily abusive [housing] environment; and (5) a basis for holding the [lessor] liable.

*See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (listing elements to prove a hostile working environment claim in the Title VII context); *see also Tagliaferri*, 486 Fed.Appx. at 774 (citing to *Mendoza* as the standard for hostile housing environment claims under the FHA, though without deciding whether sexual harassment is actionable under the FHA). DJ Mortgage only takes issue with the latter two elements, primarily arguing that Ms. West has not demonstrated "sufficiently severe or pervasive" harassment.

■ "Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (in Title VII context). The Court's prior order clarified what kind of conduct meets (or does not meet) this standard:

> Simple teasing, offhand comments, and isolated incidents that are viewed only as annoying or offensive are not sufficiently severe or pervasive to support a FHA hostile housing environment claim. *Butler*, 2013 WL 5200539, at *7. Rather, the conduct must be "serious, persistent,

and explicitly humiliating or threatening conduct." *Tagliaferri*, 486 Fed.Appx. at 774. Even one act of harassment, if it is severe enough, may support a claim for sexual harassment. *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir.2001). For example, direct contact of an intimate body part will typically support such a claim. *Id.*

*West*, 164 F.Supp.3d at 1398. The Court must consider evidence of harassment "both cumulatively and in the totality of the circumstances." *Reeves*, 594 F.3d at 808. Furthermore, the plaintiff must "subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment [here, housing], and this subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1246 (internal quotations omitted).

### a. Mr. Andrews's Conduct as "Sufficiently Severe or Pervasive"

■ DJ Mortgage argues that Plaintiff has not presented evidence of "sufficiently severe or pervasive" conduct by Mr. Andrews that could give rise to a hostile housing environment claim. In particular, DJ Mortgage emphasizes that Mr. Andrews and Ms. West only had two in-person encounters. During one of those encounters, when Mr. Andrews grabbed Ms. West's vagina in his car, DJ Mortgage cites to Ms. West's testimony that she simply "ignored" the incident and never contacted DJ Mortgage to alter the conditions of her tenancy because of it. (West Depo. at 137.) In a portion of Ms. West's October 21st letter, Ms. West states that she "brushed off" Mr. Andrews's comment that he was going to need a hug from her. (October 21st Letter.) Defendant also argues she created a "ruse" with her boyfriend to send Mr. Andrews text messages while her boyfriend pretended to be her on

her phone. (Def.'s Motion, Doc. 39–1 at 13.) DJ Mortgage contends that this evidence shows Ms. West did not subjectively perceive these interactions with Mr. Andrews to be hostile or abusive; she instead ignored or brushed them off. Furthermore, DJ Mortgage characterizes Ms. West's communications with Mr. Andrews as limited, sporadic, and as only going beyond the typical interactions between a property manager and tenant.

The Court first turns to the undisputed evidence about the incident in the car with Mr. Andrews and Ms. West. The evidence shows that this was the second time Mr. Andrews had ever met Ms. West in person. He had asked Ms. West to meet him at a parking lot to sign the final leasing paperwork and pick up her keys to the Property. He asked her to sit in his car to finish the paperwork, and while she was doing so, he sexually assaulted her. The Court's prior order on a motion to dismiss clearly stated that "[t]his conduct by itself is humiliating enough to state a claim for sexual harassment." *West*, 164 F.Supp.3d at 1399. Ms. West has now presented testimony at summary judgment that this conduct occurred. And DJ Mortgage has not presented any evidence to show that it did *not* occur.

Instead, DJ Mortgage argues that Mr. Andrews's actions were not sufficiently severe to constitute harassment because, according to Ms. West's testimony, she did not subjectively perceive it to be severe. She "ignored" it. She also did not contact DJ Mortgage about it and simply moved in the next day. This argument rings hollow for at least two reasons. First, it overlooks Ms. West's affidavit where she clearly states her subjective perception—that she "felt threatened" by Mr. Andrews after he assaulted her. (West Declaration ¶ 4.) Second, it distorts Ms. West's testimony. When asked if she ever said to Mr. Andrews that she did not want to deal with

him anymore after he assaulted her, Ms. West's more complete testimony is: "I just ignored him as far as that goes. I mean, I never really said 'I don't want to deal with you anymore' because he stated that I have to deal with him. He's the property manager. And whatever is needed, I have to go to him." (West Depo. at 137.) This testimony underscores instead of downplays the severity of Mr. Andrews's conduct as viewed through Ms. West's eyes. It does not show that Ms. West ignored his conduct because she did not view it as severe; it shows that she ignored it to the extent she could because she felt she had no other choice. Ms. West further testified that she continued to rent the Property because she "needed a home for [her] kids ... and for [her] to live," and other places she had looked at were not available at the time. (*Id.* at 303.)

A sexual harassment claim requires sufficient evidence of either severity *or* pervasiveness. Thus, "[e]ven one act of harassment, if it is severe enough, may support a claim for sexual harassment." *West*, 164 F.Supp.3d at 1398. Based on the evidence above, a jury could reasonably find that Mr. Andrews's single act of sexually assaulting Ms. West was sufficiently severe "to alter the terms and conditions of [tenancy] and create a discriminatorily abusive [housing] environment." *See Mendoza v. Borden, Inc.*, 195 F.3d at 1245.

The Court now looks to the evidence as a whole to see if it shows sufficiently severe or pervasive conduct to establish a triable jury issue on the hostile housing environment claim. A timeline of Mr. Andrews's allegedly unwelcome and sexually inappropriate conduct towards Ms. West is instructive:

- August 9, 2013: Mr. Andrews calls Ms. West to schedule a meeting for her to sign the lease and get the keys to the Property, and during the

phone call he says, "I'm going to need you to give me a hug."

- August 10, 2013: Ms. West meets Mr. Andrews in a parking lot to complete certain paperwork for the Property. He sexually assaults her in his car while she is signing the paperwork.
- Around August 11, 2013: Ms. West called Mr. Andrews about a broken air conditioning unit. He told her she had a "beautiful skin tone" and then asked if she had a boyfriend and for how long.
- August 27, 2013: Ms. West texted Mr. Andrews about fixing her door, and he responded, "Maybe I can take you to lunch are [sic] breakfast soon?"
- August 29, 2013: Ms. West texted Mr. Andrews about various repairs, and Mr. Andrews then agreed to make repairs and asked if she had given any thought to going out with him. She told him, "No, I have a boyfriend."
- September 21, 2013: Ms. West texts Mr. Andrews to thank him for replacing the carpet, and Mr. Andrews texted back: "You welcome. Maybe I can come get my pic . . . The where [sic] I can see all that sexiness . . . Just hoping there was something else I could see? . . . We should really talk in person[.]"

Furthermore, Ms. West testified that the September 21st text exchange was not an isolated incident. During other phone conversations, Mr. Andrews had asked her for nude photos, and sometimes he had asked for nude photos in exchange for repairs to the Property. Ms. West also stated that she felt threatened by Mr. Andrews's conduct towards her, to the point that she did not feel safe leaving him a key to access her home for repairs.

DJ Mortgage argues that the nature of these interactions was "grossly exaggerated" by Ms. West. In particular, DJ Mortgage takes issue with the September 21st text exchange between Ms. West and Mr. Andrews. It argues that Mr. Andrews's texts that day "could not have been severe or pervasive with respect to Plaintiff because they were not received by Plaintiff herself." (Def.'s Reply, Doc. 52 at 3–4.) DJ Mortgage further argues that Ms. West's "subjective perception of hostility does not exist" because she concocted this scheme with her boyfriend and is now trying to rely on it. (Id. at 4.) However, Ms. West testified that Mr. Andrews had initiated the text on September 21st and that she had then handed her phone to Mr. Foster to show him the text. Mr. Foster, pretending to be Ms. West, then began texting in response to Mr. Andrews. Simultaneously, Mr. Foster was reading Mr. Andrews's texts to her while she was next to him. Under these circumstances, a reasonable jury could find that this conversation was not a scheme orchestrated by Ms. West— and moreover, that Mr. Andrews directed his sexual remarks to Ms. West and that she experienced the impact of these remarks both at the time and afterward. DJ Mortgage has not presented evidence to contradict Ms. West's testimony about this text exchange.

This is not to say that evidence of the September 21st text exchange alone would be enough to show severe or pervasive sexual harassment. But when evidence of the text messages is combined with the sexual assault incident as well as the phone conversations discussing nude photos in exchange for repairs, it is sufficient to present a jury question regarding Plaintiff's severe or pervasive sexual harassment claim. A reasonable jury could conclude that these interactions—particularly in the intimate context of Ms. West's home and security, as opposed to her place of

employment—went beyond "[s]imple teasing, offhand comments, and isolated incidents that are viewed only as annoying or offensive." *Butler*, 2013 WL 5200539, at \*7. In particular, courts have held that certain combinations of inappropriate touching with unwelcome, sexual remarks may be sufficient evidence of sexual harassment. *See, e.g., Kimsey v. Akstein*, 408 F.Supp.2d 1281, 1298 (N.D. Ga. 2005) (denying summary judgment where there was "a pattern of less severe verbal harassing and touching that, viewed in its entirety and with the breast [touching] incidents, is sufficiently pervasive"); *Beliveau v. Caras*, 873 F.Supp. 1393, 1398 (C.D. Cal. 1995) (denying motion to dismiss where plaintiff alleged "several incidents in which defendant Rickell made 'off-color, flirtatious and unwelcome remarks'" and "an incident of offensive touching"). A jury could also find otherwise—that Mr. Andrews's sexual assault of Ms. West was not that severe on its own, that it was too attenuated from his subsequent conversations with her, and that their conversations amounted to mere flirtation. The point remains that Ms. West has presented enough evidence for a jury to go either way on the "sufficiently severe or pervasive" analysis. She has therefore presented a jury question as to whether Mr. Andrews's conduct created a hostile housing environment.

### b. Basis for Holding DJ Mortgage Liable for Mr. Andrews's Conduct

▮ To survive summary judgment on the hostile environment claim, Ms. West must also show that DJ Mortgage is vicariously liable for the actions of Mr. Andrews toward Ms. West. DJ Mortgage argues that, even if Mr. Andrews's conduct was "sufficiently severe or pervasive" to constitute sexual harassment of Ms. West, it cannot be held liable for his conduct. Defendant contends that Mr. Andrews acted outside the scope of his employment, and furthermore, that DJ Mortgage took "prompt and appropriate corrective action" as soon as it learned of his conduct.

▮ "[I]t is well established that the [Fair Housing] Act provides for vicarious liability." *Meyer v. Holley*, 537 U.S. 280, 287, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003); *see also United States v. Habersham Properties, Inc.*, 319 F.Supp.2d 1366, 1375 (N.D. Ga. 2003); *Hamilton*, 2016 WL 4771091, at \*4 (S.D. Ga. Sept. 12, 2016); *Richards*, 2005 WL 1065141, at \*7; *Boswell*, 2009 WL 1515872, at \*3. Since courts treat FHA claims as essentially tort claims, the traditional rules of vicarious liability apply. *Meyer*, 537 U.S. at 287, 123 S.Ct. 824; *Hamilton*, 2016 WL 4771091, at \*4 (S.D. Ga. Sept. 12, 2016). Traditional rules require a plaintiff to first establish that a principal-agent relationship exists. *Boswell*, 2009 WL 1515872, at \*3. DJ Mortgage does not argue that Mr. Andrews was not its employee or its agent when he was managing Ms. West's property, and the evidence clearly establishes such a relationship.

▮ Next, traditional rules would make a principal liable for the acts of its agent that are committed in the scope of the agent's authority. *Id.*; *Habersham Properties*, 319 F.Supp.2d at 1375. While sexual harassment committed by an agent is typically not considered within the scope of his authority, there is an exception to this rule. A principal may be vicariously liable where the agent was "was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) Agency § 219(2); *see also Boswell*, 2009 WL 1515872, at \*3.

In *Boswell*, a tenant sued her property manager, Mr. GumBayTay, and the property owner for Mr. GumBayTay's sexual harassment of her. 2009 WL 1515872, at \*2. The court found sufficient evidence that Mr. GumBayTay violated the FHA, based on facts showing that he "demanded

sexual favors from Ms. Boswell as a condition for not raising the rent and[ ], when she refused his demands, he charged her an additional $100 in rent, tried to evict her, and refused to make necessary repairs." *Id.* at *5. Turning to the property owner, then, the court acknowledged that Mr. GumBayTay's sexual harassment was outside the scope of his employment and therefore the owner ordinarily would not be liable for it. *Id.* However, the court ultimately held the owner liable because "all of Mr. GumBayTay's acts were committed in his capacity as the property manager for [the owner] and that it was the agency relationship that facilitated Mr. GumBayTay's conduct." *Id.* Specifically, Mr. GumBayTay's position as property manager allowed him to control the amount of rent collected, to determine what repairs to make, and to have "unfettered access" to the tenant. *Id.* "In other words, Mr. GumBayTay used his power as property manager as a vehicle through which to perpetrate his unlawful conduct by refusing repairs, raising the rent, and attempting to evict Ms. Boswell as consequences for Ms. Boswell's refusal to provide sexual favors." *Id.*

Ms. West has presented similar evidence of Mr. Andrews's exercise of his authority and power as property manager to try to leverage sexual favors from Ms. West. Mr. Andrews was the property manager for all of DJ Mortgage's properties, including Ms. West's property. As such, he had the authority to approve applications for tenancy, to independently approve certain repairs, to provide input on the amount of rent charged, and to evict tenants on behalf of DJ Mortgage. At the outset, Mr. Andrews coordinated Ms. West's application for tenancy, told her what she needed to do, and determined how and where they would meet in person to exchange the necessary paperwork. Ms. West had no interaction with any other representative of DJ Mortgage during the application process. During the first meeting between Mr. Andrews and Ms. West, he told her that he worked for DJ Mortgage and that she should contact him if she needed anything related to the Property. This was consistent with DJ Mortgage's policy for all tenants to contact Mr. Andrews on his personal cell phone, paid for by DJ Mortgage, should they need any repairs. DJ Mortgage did not provide its phone number on either the application or the lease agreement that Ms. West signed. During their second meeting, which Mr. Andrews had arranged at a parking lot so that Ms. West could finish signing the paperwork and pick up her keys to the Property, Mr. Andrews told Ms. West to come sit in his car and he then sexually assaulted her as she was signing the final paperwork.

Moreover, on several occasions in the following weeks, Mr. Andrews made sexual advances and requested nude photos from Ms. West contemporaneously with her requests for repairs. Specifically, he asked her over the phone more than once to give him a nude photo in exchange for providing her repairs. As Ms. West continually rebuffed him, he made some repairs but delayed or declined to make others, and at one point, he threatened to get her out of the Property and rent to someone else after she requested a repair.

In sum, sufficient evidence exists for a reasonable jury to conclude that Mr. Andrews "used his power as property manager as a vehicle through which to perpetrate his unlawful conduct," and therefore to hold DJ Mortgage vicariously liable. *Boswell*, 2009 WL 1515872, at *5; *see also Richards*, 2005 WL 1065141, at *7. A jury could also conclude otherwise—that Mr. Andrews was not using his power to lease property, refuse repairs, or threaten to evict Ms. West based on her sex or because she sexually rebuffed him, but because of other reasons related to the way

he managed DJ properties. Thus, there is enough evidence to submit the question of DJ Mortgage's vicarious liability to the jury.

DJ Mortgage argues that the proper standard for determining its liability is actually a Title VII negligence standard, not vicarious liability rules. Defendant argues that Ms. West must establish that it knew or should have known of the harassment and then failed to take prompt and appropriate corrective action. As support for this standard, DJ Mortgage cites to a handful of district court cases in the Title VII employment context. Plaintiff is correct, however, that DJ Mortgage cites to no authority for applying the Title VII negligence standard in an FHA case. Another judge in this same district expressly rejected this proposition in *United States v. Habersham Properties, Inc.*, 319 F.Supp.2d 1366, 1375 (N.D. Ga. 2003) (Martin, J.). Furthermore, a recently adopted HUD regulation explicitly rejects the Title VII standard for sexual harassment claims: "Title VII affirmative defense. The affirmative defense to an employer's vicarious liability for hostile environment harassment by a supervisor under Title VII of the Civil Rights Act of 1964 does not apply to cases brought pursuant to the Fair Housing Act." 24 C.F.R. § 100.600 (effective as of October 14, 2016). HUD explained the reasoning behind this provision in its summary of the final rule:

> HUD has retained its view that the Title VII affirmative defense is not appropriate to include as a defense under the Fair Housing Act. HUD has never found occasion to employ such a defense and remains unaware of any court having extended the Title VII affirmative defense to fair housing claims, and commenters did not identify any such case law.... Therefore, as explained in the preamble to the proposed rule, the Title VII affirmative defense is not appropri-

ately applied to harassment in the housing context because its adoption would impose burdens on victims of discriminatory harassment that are incompatible with the broad protections and streamlined enforcement mechanisms afforded by the Fair Housing Act.... HUD believes it would be inappropriate to add, for the first time, an affirmative defense that would require victims of hostile environment harassment—who are often housing insecure or otherwise especially vulnerable—to choose between the risk of retaliation by the perpetrator and the risk of losing their right to hold a housing provider liable for the acts of its agents. Instead, the traditional principles of vicarious liability—including those standards that hold a principal liable for an agent's conduct that is taken within the scope of employment, with the apparent authority of the principal, or that is otherwise aided by the agency relationship—will continue to govern a housing provider's liability for harassment.

Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 FR 63054-01. In the above summary, HUD references the preamble to the proposed rule, where HUD has provided even more reasoning for its interpretation regarding vicarious liability for sexual harassment:

> [T]he concerns that led the Supreme Court to distinguish workplace harassment by a supervisor from that by a fellow employee do not extend to the housing context where supervisory status of a housing provider's agent plays a far less significant role in facilitating harassment. While workplace harassment may be perpetrated by an agent who has no authority over the terms or conditions of the victim's employment (e.g., by a co-worker) such that the

harassment is not aided by the perpetrator's agency relationship with the employer, harassment of a homeseeker or tenant by an agent of a housing provider does involve an agent who has authority over terms or conditions of the homeseeker's or tenant's housing or housing-related services. Whether the perpetrator is a property manager, a mortgage loan officer, a realtor, or a management company's maintenance person, a housing provider's agent holds an unmistakable position of power and control over the victimized homeseeker or resident. For example, a property manager can recommend (or sometimes even initiate) the eviction of a harassment victim or refuse to renew a victim's lease, while a maintenance person may withhold repairs to a victim's apartment or may access the victim's apartment without proper notice or justification. Likewise, a realtor can refuse to show a home to or present a purchase offer from a harassment victim, while a loan officer might reject a victim's mortgage application or alter the loan terms being offered. Thus, unlike in the employment arena, an agent who harasses residents or homeseekers is aided by his agency relationship with the housing provider, whether or not a tangible housing action results. For this reason, the Title VII affirmative defense is not relevant to the effective resolution of fair housing disputes. Significantly, we are unaware of any court having extended the Title VII affirmative defense to fair housing claims.

Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 80 Fed. Reg. 63720, 63728 (proposed Oct. 21, 2015). Thus, while courts often look to Title VII when assessing FHA claims, there are strong reasons not to when assessing principal-agent liability in this specific context. Vicarious liability principles properly may be applied where a manager/broker of housing engages in sexual harassment in the course of exercising his corporate authority in directing and controlling the terms of leasing and management of an individual's housing, *Meyer*, 537 U.S. at 287–288. And the Court would be in good company in rejecting the Title VII negligence standard when assessing DJ Mortgage's liability for Mr. Andrews creating a hostile housing environment. *See, e.g., Boswell*, 2009 WL 1515872, at *5; *Hamilton*, 2016 WL 4771091, at *2; *Richards*, 2005 WL 1065141, at *2.

Even if the Court applies the Title VII negligence standard to this case, as Defendant urges the Court to do, there is still enough evidence for a jury to find DJ Mortgage liable under this standard. Defendant maintained no sexual harassment policies or training for its staff. Nor did Defendant have a standard sexual harassment complaint or investigation process that would have facilitated Ms. West's raising her concerns with DJ Mortgage attention still earlier. Ms. West testified that she sent a letter to DJ Mortgage on October 21, 2013, and she did not hear from DJ Mortgage until November 14th or 15th, when she received a letter from DJ Mortgage's attorney along with a Notice to Pay or Quit. She further testified that she tried to contact Mr. Thompson, as the attorney's letter advised her to do, but got no response. According to Ms. West, it was only during the first week of December that she received a call from Ms. Martinello regarding her letter. They then scheduled to meet in DJ Mortgage's office on December 11th to discuss the letter. DJ Mortgage representatives would not agree to discuss Ms. West's allegations over the phone with her beforehand and instead insisted on an in-person meeting, despite Ms. West's difficulty in scheduling around her work schedule. Though DJ Mortgage

acknowledges it had no established sexual harassment policies and complaint procedures, it disputes many of the facts concerning its interaction with Ms. West. But that simply means these are genuine disputes of material fact for the jury to address.

Moreover, the evidence is unclear whether or not DJ Mortgage instructed Mr. Andrews that he was not to interact with Ms. West after receiving her October 21st letter. Ms. West testified that Mr. Andrews texted her as late as October 24th about a repair. Indeed, there is *no* evidence that DJ Mortgage contacted Ms. West after receiving her October 21st letter to inform her that Mr. Andrews was no longer serving as her property manager. DJ Mortgage representatives did not confront Mr. Andrews about Ms. West's allegations until December 5th—over six weeks after her October 21st letter—and only then did they fire him. Nor does the company present evidence that it then fully investigated his conduct or reviewed his text messages. Finally, construing the evidence in favor of Plaintiff, DJ Mortgage still did not notify Ms. West until after her December 11th meeting with Defendant's representatives that Mr. Andrews was no longer employed there, thus leaving her with the sense that he still exercised control over her housing until mid December. Under the Title VII standard, a reasonable jury could view the evidence in this case and find that DJ Mortgage was negligent in handling Ms. West's sexual harassment allegations against Mr. Andrews and therefore liable for the creation of a hostile housing environment.

The Court therefore **DENIES** summary judgment on Ms. West's hostile housing environment claim.

### 2. "Quid Pro Quo" Harassment Claim

Ms. West's other sexual harassment claim against DJ Mortgage is quid pro quo harassment—"where the terms and conditions of a rental, including continued occupation, rent, and the provision of repairs, are conditioned upon compliance with the sexual demands of a landlord." *Richards*, 2005 WL 1065141, at *2. The effect is that "sexual activity has become part of the terms and conditions of the rental." *Id.*

Such harassment may be either explicit or implicit. In other words, a landlord or its agents need not explicitly state that the provision of housing benefits is conditioned on the return of sexual favors, since this sort of conditioned tenancy may be inferred from the circumstances. *Honce*, 1 F.3d at 1089; *see also United States v. Hurt*, 676 F.3d 649, 654 (8th Cir. 2012); *Quigley v. Winter*, 598 F.3d 938, 947 (8th Cir. 2010) (finding a jury could reasonably infer quid pro quo harassment where a tenant asked her landlord about receiving her deposit back, and the landlord then "fluttered his hand against [the tenant's] stomach and said, 'My eagle eyes have not seen everything yet'"). When considering the circumstances, the Court must assess the relationship between the sexual demands communicated and the housing benefits or terms threatened or promised. For instance, when a landlord discusses housing benefits at the time he is also making sexual advances, quid pro quo harassment may be inferred. *See Quigley*, 598 F.3d at 947–48; *see also Grieger v. Sheets*, No. 87 C 6567, 1989 WL 38707, at *1, *4–5 (N.D. Ill. Apr. 10, 1989). In particular, a landlord's refusal to perform repairs in connection with a tenant's rebuff of his sexual advances may be sufficient evidence of quid pro quo harassment. *See, e.g., Grieger*, 1989 WL 38707, at *5; *see also West*, 164 F.Supp.3d at 1400.

The question now is whether the evidence gleaned during discovery, and viewed in the light most favorable to Ms. West, would allow a reasonable jury to

find that quid pro quo harassment occurred in this case. The Court finds that it does. For one, DJ Mortgage does not provide any evidence to dispute Ms. West's testimony that Mr. Andrews sexually assaulted her during one of their very first meetings as property manager and soon-to-be tenant. Mr. Andrews did so while Ms. West was sitting in his car and signing paperwork to complete her application for tenancy. This assault in a lease signing context might be viewed as setting the compass for the sexual and realty management interactions of the following three months. Ms. West testified that Mr. Andrews *explicitly* asked her over the phone on more than one occasion to give him nude photos in exchange for addressing her repair requests. On other occasions, she testified that Mr. Andrews made sexual references or advances towards her at the same time that she was requesting repairs to the Property. For example, on August 27th, Ms. West contacted Mr. Andrews about repairing a door, and he asked if he could take her out to lunch or breakfast soon, to which she did not reply. On August 29th, when she contacted him again about various other repairs, he asked if she had given any thought to going out with him, and she told him, "No, I have a boyfriend." On September 21st, Ms. West thanked Mr. Andrews via text for fixing her carpet earlier. He responded via text: "You welcome. Maybe I can come get my pic ... The where [sic] I can see all that sexiness ... Just hoping there was something else I could see? ... We should really talk in person[.]" Ms. West either rejected or declined to respond to Mr. Andrews's advances.

Throughout this same period, Ms. West also presents evidence of Mr. Andrews delaying in making repairs or declining to make repairs altogether. When Ms. West contacted him about her door, he did not coordinate any repairs until she texted him again four days later. When she contacted him about a broken refrigerator and mold issues, he sent a repairman to the Property who made some repairs but did not fix these issues. When she texted Mr. Andrews about the replacement refrigerator breaking and spoiling her food, he merely responded, "Do what you have to do[.]" When she told him in late September that she had no heat, Mr. Andrews told her she had too many complaints and "he could get [her] out" of the Property. Mr. Andrews never fixed her refrigerator or her heat.[10]

The evidence construed in the light most favorable to Ms. West provides a sufficient basis for a jury to find that quid pro quo harassment occurred. *See Quigley*, 598 F.3d at 947 ("The jury could reasonably infer Winter was telling Quigley the return of her deposit was conditioned upon Winter seeing more of Quigley's body or even receiving a sexual favor ...."); *Grieger*, 1989 WL 38707, at *5 (denying summary judgment where evidence showed that the landlord "refused to perform promised repairs and made other repairs more difficult" after the plaintiff rebuffed his sexual advances); *Richards*, 2005 WL 1065141, at *2 (denying a motion to dismiss where "[t]he complaint contains allegations inferring that when it became clear that the Plaintiff was not going to acquiesce to his sexual demands, Mr. Bono raised her rent.") ("Where the terms and conditions of a rental, including continued occupation,

---

10. DJ Mortgage disputes the fact that the heat and the refrigerator were never repaired, and it cites to Mr. Thompson's deposition to rebut the fact. However, Ms. West testified that the heat was never fixed and that she had to have someone else fix the refrigerator. She also points to DJ Mortgage's invoices, which do not show repairs for heat or for the replaced refrigerator that later broke. On DJ Mortgage's motion for summary judgment, the Court resolves these disputes of fact in Ms. West's favor.

rent, and the provision of repairs, are conditioned upon compliance with the sexual demands of a landlord, then sexual activity has become part of the terms and conditions of the rental, and the landlord is liable for sex discrimination."). Specifically, a reasonable jury could infer that Mr. Andrews was depriving Ms. West of habitable housing because she would not give into his sexual requests and advances.

DJ Mortgage argues that Plaintiff has not established quid pro quo harassment because "no evidence shows that repairs or other work related to Plaintiff's rental of the Property was conditioned, either explicitly or implicitly, on Plaintiff agreeing or acceding to any purportedly improper requests that Andrews may have made." (Def.'s Motion, Doc. 39–1 at 33.) DJ Mortgage further claims that nearly all of Ms. West's repair requests were addressed. First off, DJ Mortgage's argument overlooks Ms. West's undisputed testimony that Mr. Andrews explicitly asked her over the phone, more than once, to give him nude photos in exchange for performing repairs for her. Second, Ms. West has presented evidence that Mr. Andrews did not address all of her repair requests, including heat issues, mold issues, and a broken refrigerator, and that she had to pester him to do other repairs. These facts are genuinely disputed. Furthermore, DJ Mortgage's assertion that there is "no evidence" of an implied conditioned tenancy is wrong, in light of the evidence described above and supporting case law. Ms. West has presented evidence of sexual advances contemporaneous with repair requests, followed by delayed and denied repairs and a threat of eviction.

Certainly, the evidence is not overwhelmingly in favor of Ms. West's quid pro quo claim. A jury could just as easily conclude that Mr. Andrews did not condition repairs or housing on sexual favors from Ms. West. Instead, he might be seen as a non-responsive property manager over a dilapidated property constantly in need of repair. But as stated before, there is enough evidence to establish a triable question for the jury on this claim.[11]

The Court therefore **DENIES** summary judgment on the quid pro quo harassment claim.

### B. Unlawful Interference Claim

The interference protective provision of the Fair Housing Act, 42 U.S.C. § 3617, provides that "it shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, ... any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." A plaintiff must show the following to prevail on a § 3617 interference claim: "(1) she is a member of a protected class under the FHA, (2) she was engaged in the exercise or enjoyment of a right protected by the FHA ..., (3) the defendant coerced, threatened, intimidated, or interfered with the plaintiff's exercise of her FHA rights, and (4) defendant was motivated in part by an intent to discriminate." *Sackman v. Balfour Beatty Communities, LLC*, No. CV 113-066, 2014 WL 4415938, at *10 (S.D. Ga. Sept. 8, 2014); *see also Sofarelli v. Pinellas Cty.*, 931 F.2d 718, 722 (11th Cir. 1991) (stating that a plaintiff must show that discriminatory intent "played some role" in the de-

---

11. DJ Mortgage has not argued that Ms. West cannot hold it vicariously liable for quid pro quo harassment. Case law also indicates that such an argument is likely fruitless, because under Title VII standards, quid pro quo harassment means "the employer is automati- cally held vicariously liable for the harassment." *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001). Therefore, the Court does not address vicarious liability in this context.

fendants' actions to prevail on the § 3617 claim). On the fourth element, a plaintiff may establish that the defendant had discriminatory intent either directly (using direct or circumstantial evidence) or indirectly (using the *McDonnell Douglas* burden-shifting method). *Sackman*, 2014 WL 4415938, at *10. DJ Mortgage does not contest the first two elements, so the Court addresses only the latter two elements.

■ Ms. West claims that DJ Mortgage unlawfully interfered with her rights after receiving the October 21st letter by failing to make crucial repairs to her home (including her heat) and then evicting her under the pretext of her nonpayment of rent. Ms. West argues that DJ Mortgage saw her as a problem tenant based on her filing a sexual harassment complaint and was taking steps to remove her—by continually ignoring her requests for heat, and also by sending her Notices to Pay or Quit and then filing a dispossessory action against her. DJ Mortgage argues that this interference claim cannot survive summary judgment primarily because Ms. West has not shown that DJ Mortgage acted with discriminatory intent towards her. Specifically, DJ Mortgage contends that it has presented a legitimate, non-discriminatory reason for taking steps to evict Ms. West, and then actually evicting her, based on her nonpayment of rent. According to DJ Mortgage, Ms. West has failed to show that its reason was pretextual.

■ The evidence in the record, when construed in the light most favorable to Ms. West, could allow a jury to infer unlawful interference of Ms. West's rights—but only on a limited temporal basis. The Court first considers the period from approximately October 21st, when DJ Mortgage received Ms. West's letter about sexual harassment, through the end of December 2013. DJ Mortgage argues that it had legitimate, non-discriminatory rea-

sons for its actions during this period. It sent Ms. West the November Notice to Pay or Quit on or about November 14th because she had not paid her rent at the beginning of the month. It nevertheless agreed on December 11th to make certain repairs for Ms. West in return for her paying the rent due at the end of the month, and it sent Ms. West the December Notice to Pay or Quit on December 19th when she again failed to pay her December rent. It is true that, under Georgia law, a tenant's obligation to pay rent is independent from her obligation to receive reasonable repairs. *Lewis & Co. v. Chisholm*, 68 Ga. 40, 46 (1881) ("The landlord's covenant to repair, and the tenant's to pay rent, are independent covenants, and at common law a breach of the former is no bar to an action on the latter."). In certain circumstances, a tenant may deduct a portion of rent for repairs that she made herself, but she cannot lawfully withhold rent for lack of repairs. *Borochoff Properties, Inc. v. Creative Printing Enterprises, Inc.*, 233 Ga. 279, 210 S.E.2d 809, 810 (1974).

The close timing of DJ Mortgage's November Notice to Pay or Quit, following on the heels of Ms. West's October sexual harassment complaint, is suggestive of retaliation. Still, the undisputed facts are that she had not paid her November rent on time, and she was not lawfully allowed to withhold rent for outstanding repairs. Defendant's legitimate business explanation of the November notice (sent while Mr. Andrews remained in management) might defeat the notion of reprisal and interference, except for the inferences raised by the quick course events in October and November when considered in conjunction with the sequence of events in December.

DJ Mortgage representatives insisted on holding an in-person meeting with Ms.

West to discuss her October 21st letter, as opposed to speaking with her over the phone. Ms. Martinello reached out to Ms. West to schedule the meeting in early December, depending on whose testimony is believed. Their meeting ultimately took place on December 11th. At the meeting, DJ Mortgage representatives then entered into an agreement with Ms. West, whereby Ms. West would resume paying rent, contingent on DJ Mortgage's making the repairs to her home. Specifically, Mr. Thompson testified that Ms. West had until the end of December to pay the rent due. (Thompson Depo. at 109–110.) Nevertheless, about a week later on December 19th, DJ Mortgage sent Ms. West a Notice to Pay or Quit for failure to pay rent. This notice was directly counter to the agreement struck on December 11th, which allowed Ms. West to start paying rent by the end of the month and provided that Defendant would make the necessary home repairs she requested. If DJ Mortgage's real reason for sending this notice was nonpayment of rent, why did it voluntarily enter into an agreement just one week earlier that postponed the nonpayment issue until the end of December? And why was Ms. West left in a frigid apartment, with nonfunctional heat? This evidence calls into question DJ Mortgage's real reason for sending the December notice as well as the earlier November notice. The evidence would allow a reasonable jury to infer discriminatory intent on DJ Mortgage's part, particularly given the proximity between Ms. West's complaint and the November notice, as well as the fact that the December notice ensued soon after the December 11th meeting where Ms. West aired her allegations in detail. The evidence also might be viewed as manifesting an intent to cause Ms. West to leave or quit her home as the Defendant failed to address the extreme adverse conditions that it had agreed to repair. In short, there is sufficient evidence upon which a jury could base a determination of Defendant's intent to discriminate and interfere with Plaintiff's exercise of her FHA rights under these circumstances. Once again, though, the jury could reach the opposite conclusion based on the evidence of non-payment of rent in this time frame.

Ms. West's argument that DJ Mortgage continued to unlawfully interfere with her rights—by not fixing her heat in January and also in the following months—does not hold the same traction due to the passage of time and the requirements of Georgia landlord-tenant law. Though DJ Mortgage agreed to fix Ms. West's heat on December 11th, its alleged failure to do so does not justify Ms. West's continued nonpayment of rent over the next several months *after* December. An inference of discrimination and interference with Ms. West's protected activity becomes increasingly more attenuated as the months of unpaid rent piled up from January onward. The Court recognizes that DJ Mortgage may have failed to repair basic habitability problems in Ms. West's home and that this circumstance likely may have prompted Ms. West's continued withholding of rent. However, Ms. West had other remedies available to her to address these circumstances rather than prolonged rent withholding. *See, e.g., Borochoff Properties, Inc.*, 210 S.E.2d at 810 ("[T]he remedy of the tenant is, after reasonable opportunity to the landlord, and failure by him to repair, to make the repairs himself and look to the landlord for reimbursement, or to occupy the premises without repair, and hold the landlord responsible for damages by action or by recoupment to an action for the rent.") (quoting *Lewis & Co. v. Chisholm*, 68 Ga. 40, 40 (1881)); *see also* William J. Dawkins, Ga. Landlord & Tenant—Breach & Remedies § 2:7 (5th ed. 2016). Once it became clear by the end of December that Defendant was not going to repair her heat per the December 11th agreement,

Ms. West could have notified Defendant that she would arrange for repair of her furnace and then deduct the cost of that repair from her next month's rent, all while continuing to pay the remainder of the rent due, as authorized under Georgia law. Such an action would be consistent with Georgia landlord-tenant law and also with Defendant's prior practice when it credited Ms. West for her expenditure on her refrigerator repair. When her refrigerator broke at the end of September 2013 and Mr. Andrews refused to repair it, Ms. West paid someone else to fix it and, accordingly, DJ Mortgage deducted her rent by the cost of the repair and the spoiled food. Thus, Ms. West knew how to pay for repairs herself and then demand a deduction in rent for them.

Ms. West has not presented sufficient evidence to indicate that DJ Mortgage's business reason for eventually evicting her in April 2014, based on multiple months of unpaid rent, was false or pretextual. In turn, Plaintiff has failed to show that Defendant was motivated by discrimination or reprisal for Plaintiff's engaging in protected FHA conduct when it proceeded with the April 2014 eviction action. The Court therefore finds that Ms. West has presented insufficient evidence to support a reasonable jury's finding that Defendant proceeded with her eviction in April 2014 based on its intent to discriminate and interfere with Plaintiff's exercise of her FHA rights.

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** summary judgment on this claim.

## IV. CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** DJ Mortgage's Motion

for Summary Judgment [Doc. 39]. The Court **ORDERS** the parties to engage in mediation and refers this case to the next available Magistrate Judge, or a private mediator of the parties' choosing, for this purpose. The mediation shall be completed by October 27, 2017, unless additional time is needed or requested by the Magistrate Judge (or private mediator). The Court **ORDERS** this case **ADMINISTRATIVELY CLOSED** [12] for purposes of mediation.

In the event the mediation is not successful, the parties shall move to re-open the case within five days of the conclusion of mediation, and the parties shall file a joint pretrial order within twenty days after the case has been re-opened. In the event the mediation is successful, the parties shall notify the Court within five days of the conclusion of mediation and shall file the necessary documents to dismiss this case by a date certain at the conclusion of mediation.

**IT IS SO ORDERED** this 14th day of September, 2017.

---

12. Administrative closure of a case is a docket control device used by the Court for statistical purposes. Administrative closure of a case does not prejudice the rights of the parties to litigation in any manner. The parties may move to re-open an administratively closed case at any time.